**In re Bernard & Dana NEVERLA,
Debtors.**

**Bankruptcy No. 95–22789.**

United States Bankruptcy Court,
W.D. New York.

April 16, 1996.

Peter A. Lheron, Rochester, New York, for Debtors.

George M. Reiber, Chapter 13 Trustee, Rochester, New York.

Peter Scribner, Rochester, New York, for Citibank.

## DECISION & ORDER

JOHN C. NINFO, II, Bankruptcy Judge.

### BACKGROUND

On November 21, 1995, Bernard and Dana Neverla (the "Debtors") filed a Petition initiating a Chapter 13 case. On their schedules, the Debtors showed their joint ownership of a residence at 266 Westchester Avenue, Rochester, New York ("Westchester"), and further indicated that: (1) the property had a fair market appraised value of $78,500.00; (2) there was a 1987 first mortgage on the property in favor of Norwest Mortgage ("Norwest") with an outstanding balance of approximately $75,000.00 (the "Norwest Mortgage"); (3) there was a 1991 equity loan second mortgage on the property in favor of Citibank ("Citibank") with an outstanding balance of approximately $9,800.00 (the "Citibank Mortgage"); and (4) there was a 1994 equity loan third mortgage on the property in favor of Eastman Savings & Loan Association ("Eastman Savings")[1] with an outstanding balance of approximately $5,000.00 (the "Eastman Savings Mortgage").

Along with their Petition, the Debtors filed a Chapter 13 Plan (the "Plan") which proposed to: (1) continue to pay the Norwest Mortgage, which was not in default, outside the Plan according to its terms; (2) pay through the Plan to Citibank, as a secured creditor, the two monthly payments which were then in arrears on the Citibank Mortgage and the additional amount of $3,348.00, which represented the allowed secured claim of Citibank after the application of Section 506(a)[2] (the equity in Westchester over and above the balance due on the Norwest Mortgage); (3) treat the remaining balance due on the Citibank Mortgage and the entire balance due on the Eastman Savings Mortgage as unsecured claims, to be paid the same dividend through the Plan as other unsecured creditors (approximately 18.5%); and (4) in accordance with Section 506(d), avoid the liens of the Citibank and Eastman Savings Mortgages on Westchester to the extent of the unsecured balance due.

As required by the Court whenever a Chapter 13 plan proposes to reduce a secured claim by valuing the collateral which secures it, the Debtors provided Citibank and Eastman Savings with a special notice (the "Confirmation Notice") of an adjourned confirmation hearing on March 4, 1996. The Notice included a copy of the Plan as well as a detailed explanation of the treatment that the Plan proposed for the Citibank and Eastman Savings Mortgages.

In response to the Confirmation Notice, Citibank filed an Objection to Confirmation

---

1. In 1994, the only individuals eligible to apply for an Eastman Savings equity loan were Eastman Kodak Company employees, retirees or members of their immediate household.

2. Sections 506(a) and 506(d) provide:

 (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so

subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

 (d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—
 (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or
 (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

which asserted that Section 1322(b)(2) [3] and the decision of the United States Supreme Court in *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), prohibited the proposed treatment of the Citibank Mortgage.

At the March 4, 1996 adjourned confirmation hearing, the Debtors acknowledged that Citibank's position was correct, and that the Citibank Mortgage could not be modified as proposed. The Debtors then orally modified the Plan to provide for the payment through the Plan of the Citibank Mortgage arrearages and for the payment outside the Plan of the regular monthly payments on the Citibank Mortgage as they became due, until the Citibank Mortgage was paid in full.

No pleadings of any kind were filed on behalf of Eastman Savings in response to the Confirmation Notice or otherwise in connection with the Plan or the adjourned confirmation hearing, and Eastman Savings did not appear at the March 4, 1996 adjourned confirmation hearing.

Notwithstanding the failure of Eastman Savings to appear, because the Court believed that the treatment proposed by the Plan for the Eastman Savings Mortgage was a modification which was not permitted by Section 1322(b)(2), it declined to confirm the Plan as orally amended. At the request of the Debtors' attorney and the Chapter 13 Trustee, the confirmation hearing was further adjourned to afford the Debtors an opportunity to decide whether to file another amended plan. The Debtors' and the Chapter 13 Trustee also requested that the Court file a written decision in this matter.

## DISCUSSION

■ At oral argument, the Debtors asserted that a number of the bankruptcy courts within the Second Circuit have held that Section 1322(b)(2) does not prohibit a Chap-

ter 13 plan from: (1) treating the claim of a "Homestead Mortgage" [4] holder whose claim is determined to be wholly unsecured under Section 506(a) as an unsecured claim; and (2) avoiding that holder's mortgage lien pursuant to Section 506(d). The Debtors encouraged the Court to accept the reasonings set forth by then Chief Bankruptcy Judge Robert L. Krechevsky in *Matter of Plouffe*, 157 B.R. 198 (Bankr.D.Conn.1993), Bankruptcy Judge Alan H.W. Shiff in *In re Hornes*, 160 B.R. 709 (Bankr.D.Conn.1993), and Bankruptcy Judge Dorothy Eisenberg in *In re Sette*, 164 B.R. 453 (Bankr.E.D.N.Y.1994.)

I have great respect for each of these judges who together have nearly forty years of experience as bankruptcy judges. However, I must respectfully disagree that Section 1322(b)(2) and the decision of the United States Supreme Court in *Nobelman v. American Savings Bank* permit a Chapter 13 plan to treat the claim of a Homestead Mortgage holder, such as Eastman Savings, as an unsecured claim and to avoid the underlying mortgage lien through the use of Sections 506(a) and 506(d).

■ Although I acknowledge and appreciate the technical statutory analysis set forth so succinctly in the *Plouffe, Hornes* and *Sette* decisions, I believe that a more appropriate, literal and functional reading of Section 1322(b)(2), necessitated by its legislative history, the *Nobelman* decision and the failure of the United States Congress to redraft this subsection as part of the Bankruptcy Reform Act of 1994 [5], requires the conclusion that the right of a Homestead Mortgage claimant to be paid in full, even if wholly unsecured, cannot be modified by a Chapter 13 plan. If such Homestead Mortgage claims are to be so modified in future Chapter 13 cases, it should only be after the United States Congress has so clarified Section 1322(b)(2) to

---

3. Section 1322(b)(2) provides that:
    (b) Subject to subsections (a) and (c) of this section, the plan may—
    (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

4. For the purposes of this Decision and Order, a Homestead Mortgage is a mortgage secured only by a security interest in real property that is the debtor's principal residence.

5. Pub.L. No. 103–394 (1994).

specifically provide for such modifications, and not as the result of further judicial interpretations of that subsection.

## I. *Legislative History*

The United States Court of Appeals for the Fifth Circuit in its decision in *Grubbs v. Houston First American Savings Ass'n*, 730 F.2d 236 (5th Cir.1984) discussed in detail the legislative history of Section 1322(b). This legislative history indicates that the United States Congress, in response to the concerns of secured creditor advocates, intended to provide a more favorable treatment to residential mortgagees than to the holders of security interests in other assets of a Chapter 13 debtor. As a result, Section 1322(b) prevents the modification of the rights of a holder of a Homestead Mortgage, including the right not to have the amount of the Homestead Mortgagee's secured claim reduced by the use of Section 506(a) to the fair market value of the collateral. As Justice Stevens noted in his concurring opinion in *Nobelman v. American Savings Bank*, this "favorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market." *Nobelman*, 508 U.S. at 332, 113 S.Ct. at 2112.

## II. *Nobelman v. American Savings Bank*

In its *Nobelman* decision, the United States Supreme Court unanimously held that Section 1322(b)(2) prohibited a Chapter 13 debtor from relying on Section 506(a) to reduce the amount to be paid on an undersecured Homestead Mortgage to the fair market value of the debtor's residence. By not allowing the mortgage to be so modified, the *Nobelman* decision required the Chapter 13 debtor to pay in full a Homestead Mortgage which had an unpaid balance of $71,335.00 where the residence had a fair market value of only $23,500.00.[6]

Although the Supreme Court in *Nobelman* noted that the holder of the Homestead Mortgage in that case had an allowed secured claim after the application of Section 506(a), it nevertheless emphasized that the focus of Section 1322(b)(2) was on the bargained for rights of the holder of a Homestead Mortgage, rights which are granted to it under the mortgage contract, and indicated that the Section 506(a) determination "does not necessarily mean that the 'rights' the bank enjoys as a mortgagee, which are protected by § 1322(b)(2), are limited by the valuation of its secured claim." *Nobelman*, 508 U.S. at 329, 113 S.Ct. at 2110.

Furthermore, the Supreme Court specifically rejected the "rule of the last antecedent" and rejected an interpretation of Section 1322(b)(2) which would protect only a Section 506(a) "secured claim" of a holder of a Homestead Mortgage. *Nobelman*, 508 U.S. at 330, 113 S.Ct. at 2110.

I believe that the *Nobelman* decision requires a functional reading of Section 1322(b) and the conclusion that its protection is afforded to all properly perfected holders of Homestead Mortgages. This is because such properly perfected Mortgagees are literally "secured only by a security interest in real property that is the debtor's principal residence",[7] irrespective of whether they are wholly, partially, or totally unsecured after the application of Section 506(a). This literal and functional interpretation is consistent with the emphasis in the *Nobelman* decision on the state law contractual rights bargained for by the mortgagor and mortgagee and with the legislative history which indicates that the subsection was intended to encourage the flow of capital into the home lending market and to exempt such Mortgages from valuations and bifurcations as the result of an application of Section 506(a).

I acknowledge the well-reasoned, technical interpretations and arguments regarding Section 1322(b)(2) and the *Nobelman* decision set forth in the *Plouffe, Hornes* and *Sette* decisions. However, I believe that a functional interpretation, possibly somewhat

---

**6.** Under the *Nobelman* decision, the debtors were required to pay $47,835.00 on a mortgage not supported by collateral value in order to retain their residence. Under this Decision and Order, the Debtors may be required to pay only $11,300.00 of mortgages not supported by collateral value in order to be able to retain their residence.

**7.** 11 U.S.C. § 1322(b)(2).

more difficult to support because of the less than clear statutory language and the unclear reference in the *Nobelman* decision to the use of Section 506(a) by the Chapter 13 debtor, better reflects the Congressional intent and the interpretation of Section 1322(b)(2) set forth in the *Nobelman* decision.

## III. *Practical Results*

### a. *Focus on Rights and Favorable Treatment vs. Secured Value*

In *Matter of Plouffe,* Chief Judge Krechevsky asserts that to allow a totally unsecured, subordinate mortgage to be protected by Section 1322(b)(2) from modification, and, therefore, to be paid, is contrary to the fundamental scheme and principles of the Bankruptcy Code, 157 B.R. 198, 200 (Bankr. D.Conn.1993). While that may be true, it was the clear intent of Congress in enacting Section 1322(b)(2) to change the scheme of the Code with respect to Homestead Mortgages that were not fully secured. That was specifically what the secured creditor advocates wished, and what Congress responded to.

The *Nobelman* decision was consistent with the legislative history and Congressional response when it required the payment in full of a $71,335.00 mortgage secured by a residence worth only $23,500.00. This was because the *Nobelman* decision correctly pointed out that the focus of Section 1322(b)(2) is on the rights and status of a Homestead Mortgage holder, not on the value of its collateral. If the focus of Section 1322(b)(2) were on the value of the collateral, the result in the *Nobelman* decision would not make sense when viewed in light of the fundamental scheme and principals of the Bankruptcy Code regarding secured and unsecured claims.

On the other hand, a technical rather than functional reading of Section 1322(b)(2), as advanced by the *Plouffe, Hornes* and *Sette* decisions, would render unsecured a nominal $2,000.00 second mortgage, held by a good faith lender like Eastman Savings, if the prior liens on a debtor's residence, including those resulting from the debtor failing to pay such obligations as real estate taxes, water charges or other items which might become a lien on the residence under state or local law, exceeded the value of the residence by just $1.00.[8]

### b. *Potential Pre–Bankruptcy Planning Abuse*

If subordinate Homestead Mortgages can be modified and treated as unsecured if not supported by collateral value, debtors may have an incentive not to pay prior mortgages or other charges which can become a lien on their residence until such time as these non-payments result in negative equity for a subordinate Homestead Mortgage. This might be considered to be abusive pre-bankruptcy planning by some, but perfectly permissible by others. However, it would clearly not

---

8. Although it is unlikely that a debtor would propose to retain such a homestead, the *Nobelman* decision, which determined that Section 1322(b)(2) focuses on rights and intended favorable treatment, would require a debtor to pay a second lien Homestead Mortgage with a balance of $200,000.00 if supported by a mere $1.00 in value after the application of Section 506(a):

| | |
|---|---|
| Fair Market Value of Residence | $ 100,000.00 |
| First Mortgage Balance | 99,999.00 |
| Equity Over First Mortgage | $ 1.00 |

Result under *Nobelman:*
Second Mortgage of $200,000.00 is not subject to modification

A reading of Section 1322(b)(2) which determines that it focuses on the value of the collateral rather than rights and intended favorable treatment, could result in a more nominal second mortgage lien of $2,000.00 being subject to modification after the application of Section 506(a):

| | |
|---|---|
| Fair Market Value of Residence | $ 100,000.00 |
| First Mortgage Balance | 99,000.00 |
| Unpaid Real Estate Taxes due January 30 | 1,001.00 |
| Equity Over First Mortgage | $ (1.00) |

Result in a case filed February 1:
Second Mortgage of $2,000.00 is subject to modification, treated as unsecured and the underlying lien is avoided.

further the underlying Congressional intent of encouraging the flow of capital into the home lending market.[9]

## IV. General

### a. A Changing Marketplace

In 1977, when Section 1322(b)(2) was finally enacted, it may have been true that: (1) there was a general anticipation that real estate values would not decline but would always continue to increase, even if at differing rates; (2) it was not anticipated that the income tax laws would change to allow consumers to deduct non-business interest only if paid on Homestead Mortgages; and (3) it was not predictable that there would develop an active and extensive secondary mortgage market and that financial institutions would develop and aggressively market numerous subordinate Homestead Mortgage products. However, by the time of the enactment of the Bankruptcy Reform Act of 1994, Congress was aware that: (1) all of the foregoing had happened; (2) the United States Supreme Court had decided *Nobelman v. American Savings Bank*, essentially overturning the interpretation of the majority of the Circuit Courts which had construed Section 1322(b)(2); and (3) numerous discussions and law review articles had addressed the problem of Chapter 13 cases with wholly unsecured Homestead Mortgages, many of which were wholly unsecured at the time they came into existence. Nevertheless, Congress did not redraft Section 1322(b)(2), even though it did make changes to Subsections 1322(b)(3) and 1322(b)(5).

It is difficult, given the legislative history of Section 1322(b)(2) and the decision of the United States Supreme Court in *Nobelman v. American Savings Bank*, to assume that Congress believed it was unnecessary to further clarify Section 1322(b)(2) because the legislative history and *Nobelman* could only result in Bankruptcy Courts determining that fully secured Homestead Mortgages were to be paid in full, undersecured Homestead Mortgages, even if supported by only one dollar in collateral value, were to be paid in full because the rights of the holders of such undersecured Homestead Mortgages were to be fully protected, and wholly unsecured Homestead Mortgages were to be modified, treated as unsecured, and the underlying mortgage liens avoided, even if they were determined to be unsecured after the application of Section 506(a) because prior liens on the residence exceeded its fair market value by a mere one dollar.

In light of the legislative history of Section 1322(b)(2), the decision of the United States Supreme Court in *Nobelman v. American Savings Bank* and the failure of Congress to redraft Section 1322(b)(2) after the *Nobelman* decision when it was fully aware of the controversy with regard to wholly unsecured Homestead Mortgages, the most reasonable construction of Section 1322(b)(2) is the literal and functional interpretation which results in it protecting from modification in Chapter 13 cases all properly perfected Homestead Mortgages irrespective of the value of the debtor's residence.

### b. Predictability and Fairness

This literal and functional interpretation of Section 1322(b)(2) provides predictability, is fair and equitable to both Homestead Mortgage holders and debtors, and prevents pre-bankruptcy planning abuse with respect to subordinate Homestead Mortgages. Outside of bankruptcy, part of the bargain entered into between a secured creditor and a debtor is that the debtor will pay the secured loan in full or not retain the collateral which will be realized on by the secured creditor. Although the Bankruptcy Code in some situations changes this bargain and allows a debtor to retain certain collateral by

---

9. Interestingly, the avoided Homestead Mortgage holder in the *Hornes* case was wholly unsecured because the residence had a fair market value of $93,000.00, a first mortgage balance of $92,412.45, leaving equity of approximately $600.00; however, there was a $1,217.97 first priority lien apparently due to an unpaid Water Pollution Control Authority charge, presumably payable directly by the debtor. If the debtor had paid all, or just 52% of that water charge, the subordinate Homestead Mortgage holder in *Hornes* would have been required to be paid in full under the *Nobelman* decision.

paying only its fair market value [10], the legislative history to Section 1322(b)(2) and the decision of the United States Supreme Court in *Nobelman v. American Savings Bank* tell us that at least in the case of partially secured Homestead Mortgages, the bargain is to be honored, and debtors cannot retain their residence unless they pay the Homestead Mortgage in full.

Under the literal and functional interpretation of Section 1322(b)(2), debtors, consistent with the mortgage contract that they sign, will be expected to pay in full any Homestead Mortgages if they wish to retain their residence, always having the alternative of surrendering the residence and obtaining a discharge in bankruptcy from any deficiency if one or more of the Homestead Mortgages which they have executed are not fully secured. No involuntary servitude results from a functional interpretation of Section 1322(b)(2). If debtors are concerned about having to ultimately honor this bargain, they can and should obtain credit in a different form or live without the credit.

### CONCLUSION

Confirmation of the Debtors' orally amended Chapter 13 Plan which provides for the modification of the Eastman Savings & Loan Association Mortgage on 266 Westchester Avenue, Rochester, New York, contrary to the provisions of Section 1322(b)(2), is denied.

**IT IS SO ORDERED.**

---

10. In some circumstances, this is for the benefit of the debtor; for example, redemption under Section 722. In other circumstances, it is for the ultimate benefit of all creditors.