### In the Matter of Elzena R. ROBINSON, Debtor.

**Bankruptcy No. 97–15551.**

United States Bankruptcy Court, D. New Jersey.

Oct. 29, 1997.

Judith S. Schwartz, West Collingswood, New Jersey, for debtor.

Judith Jennings, Medford, New Jersey, for Village of Timber Creek Condominium Association.

### *AMENDED OPINION*

JUDITH H. WIZMUR, Bankruptcy Judge.

We have before the court for resolution debtor's motion seeking to reclassify the condominium association's secured claim as a general unsecured claim and to "strip off" the association's lien because it is wholly undersecured.

### *FACTS*

The debtor, Elzena R. Robinson, filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on June 12, 1997. The debtor scheduled her personal residence at 1008 Timber Creek Village, Lindenwold, New Jersey with a fair market value of $48,000.00, subject to a first mortgage in the amount of $63,015.00 held by Norwest Mortgage, Inc. Debtor listed the Village of Timber Creek Condominium Association ("the

Association") as an unsecured creditor holding a claim in the amount of $2,000.00 for outstanding condominium fees. Debtor's proposed plan envisioned payments of $400.00 per month for 12 months, followed by $525.00 per month for 48 months with payment in full to counsel, the IRS, and the Camden County MUA. Arrearages owed to Norwest were to be cured through the plan. Claims held by Franklin Acceptance Corporation and Levitz Furniture were to be crammed down. Unsecured creditors were to receive nothing.

On July 3, 1997, the Association filed an objection to the debtor's plan, asserting that it held a secured interest in the debtor's principal residence as a result of a lien for past due condominium fees. As of the date of the debtor's petition, the Association claims it was due $3,359.83. The Association filed a secured proof of claim in that amount on July 15, 1997, with reference to a judgment dated March 1, 1996.

On August 13, 1997, the debtor moved to reclassify the Association's asserted secured claim as a general unsecured claim pursuant to the cram down provisions under 11 U.S.C. § 506. Because the debtor's personal residence was overencumbered as a result of Norwest's mortgage, the debtor contends that the Association's claim has nothing to attach to and should be reclassified as a general unsecured claim without priority. Since the Association does not hold a "secured claim" for purposes of § 506(a), it is not protected by the anti-modification provisions of § 1322(b)(2).

## DISCUSSION

At issue in this case is the interplay between 11 U.S.C. § 506 and 1322(b)(2) as interpreted by the Supreme Court in *Nobelman* and as applied in the context of stripping off wholly undersecured junior interests. We note first in this respect that the Association disputes its characterization as a wholly undersecured creditor. There appears to be some dispute over the valuation of debtor's principal residence and of the amount due to Norwest.

Debtor has scheduled the fair market value of her condominium as $48,000.00, and the Association has offered two HUD–1 Settlement Statements as evidence that debtor's property is undervalued. The Association notes that the debtor purchased her property on September 30, 1994 for $54,500.00. The Association contends that debtor's property is more properly valued around $55,000. Norwest has filed a proof of claim in this case in the amount of $61,407.93. Regardless of whether we accept the debtor's valuation or the Association's valuation, the Association's position would still be wholly undersecured.

Section 1322(b)(2) of the Bankruptcy Code provides that the debtor's plan may:

> modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2). At issue here is the language "rights of holders of secured claims." [1] The interplay of this particular

---

1. As a preliminary matter, we find that the proper characterization of the Association's lien is as a security interest. The Association argues at different points in its briefs that its interest is a security interest and then later that it is a statutory lien. The confusion occurs because the Association's lien is supported both by the Association's bylaws and by state law. *See* By–Laws, Section D. Defaults in Payment of Assessments.

   A Unit Owner shall, by acceptance of title, be conclusively presumed to have agreed to pay his proportionate share of Common Expenses accruing while he is the Owner of a Unit. The Association shall have a lien on each Unit for any unpaid assessment ... together with interest thereon, court costs and attorneys' fees, if any are incurred by the Board or Association in collecting such assessment. Such lien shall be effective from and after the time of recording in the public records of Camden County of a claim of lien.... Such claim of lien shall include only sums which are due and payable when the claim of lien is recorded.

   *See also* N.J.S.A. 46:8B–21 ("The association shall have a lien on each unit for any unpaid assessment duly made by the association for a share of common expenses ... upon proper notice to the appropriate unit owner."). We conclude that the Association's lien is a security interest agreed to by the parties and provided for by statute. *See* 11 U.S.C. § 101(53).

section with section 506(a) in the context of an undersecured homestead mortgage was addressed by the United States Supreme Court in *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

In *Nobelman*, the debtors proposed under their Chapter 13 plan to bifurcate the claim held by American Savings Bank against the debtors' principal residence into secured and unsecured claims and then to reduce the mortgage to the fair market value of the residence. The debtors proposed to pay the fair market amount plus prepetition arrearages through their plan, and to discharge the remaining unsecured portion of American's claim. *Id.* at 326, 113 S.Ct. at 2108–09. In response to the bank's objection, the debtors argued that "Section 506(a) provides that an allowed claim secured by a lien on the debtor's property 'is a secured claim to the extent of the value of [the] property'; to the extent the claim exceeds the value of the property, it 'is an unsecured claim.'" *Id.* at 328, 113 S.Ct. at 2109. "Under this view, the bank is the holder of a 'secured claim' only in the amount of ... the value of the collateral property." *Id.*

The Court declined to adopt this view of section 506(a), stating that this "interpretation fails to take adequate account of § 1322(b)(2)'s focus on 'rights.'" *Id.* The Court explained that section 1322(b)(2):

> does not state that a plan may modify "claims" or that the plan may not modify "a claim secured only by" a home mortgage. Rather, it focuses on the modification of the "rights of holders" of such claims. By virtue of its mortgage contract with petitioners, the bank is indisputably the holder of a claim secured by a lien on petitioners' home.

*Id.* at 328–29, 113 S.Ct. at 2109–10.

The Court recognized that a portion of the bank's claim exceeded the value of the collateral and qualified as an unsecured component of the bank's claim under § 506(a); however, the Court stressed that "that determination does not necessarily mean that the 'rights' the bank enjoys as a mortgagee, which are protected by § 1322(b)(2), are limited by the valuation of its secured claim."

*Id.* at 329, 113 S.Ct. at 2110. The term "rights" is not defined by the Code, but appears to refer to the mortgagee's rights under the relevant security documents and state law. *Id.* With respect to a mortgagee, the Court found those rights to include "the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." *Id.* "These are the rights that were 'bargained for by the mortgagor and the mortgagee,' and are rights protected from modification by § 1322(b)(2)." *Id.* at 329–330, 113 S.Ct. at 2110 (quoting *Dewsnup v. Timm*, 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992)).

The Court declined to apply the "rule of the last antecedent" under which "the operative clause 'other than a claim secured only by a security interest in ... the debtor's principal residence' must be read to refer to and modify its immediate antecedent, 'secured claims.'" *Id.* at 330, 113 S.Ct. at 2111. Instead, the Court found that:

> Congress chose to use the phrase "claim secured ... by" in § 1322(b)(2)'s exception, rather than repeating the term of art "secured claim." The unqualified word "claim" is broadly defined under the Code to encompass any "right to payment, whether ... secure[d] or unsecured" or any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether ... secure[d] or unsecured."

*Id.* at 331, 113 S.Ct. at 2111. Therefore, the Court determined to read "'a claim secured only by a [homestead lien]' as referring to the lienholder's entire claim, including both the secured and the unsecured components of the claim." *Id.* Accordingly, "Section 1322(b)(2) prohibits ... a modification where, as here, the lender's claim is secured only by a lien on the debtor's principal residence." *Id.* at 332, 113 S.Ct. at 2111.

Following the Supreme Court's decision in *Nobelman*, two lines of cases have evolved with respect to the debtor's ability to strip down or strip off wholly undersecured security interests. Both lines rely upon language quoted from *Nobelman*.

The debtor urges us to adopt the reasoning presented in *In re Lam*, 211 B.R. 36 (9th Cir. BAP 1997). In *In re Lam*, the court concluded that the "*Nobelman* decision prohibiting the removal of a partially unsecured claim is decidedly different from requiring a chapter 13 debtor to continue to pay the mortgage contract when the mortgage lien attaches to nothing and the lien ceases to be a secured claim." "If a lien has no 'security' interest in the property of a debtor, its status as a lien is questionable." *Id.* The "rights" of such a lien holder would be "empty rights from a practical, if not a legal, standpoint." *Id.* The court pointed out that:

A forced sale of the property would not result in any financial return to the lienholder, even if a forced sale could be accomplished where the lien attaches to nothing. Nothing secures the "right" of the lienholder to continue to receive monthly installment payments, to retain the lien until the debt is paid off, or the right to accelerate the loan upon default, if there is no security available to the lienholder to foreclose on in the event the debtor fails to fulfill the contract payment obligations.

*Id.*

Turning to the *Nobelman* decision, the court agreed with those decisions which concluded that under *Nobelman*, " 'the mortgagee must qualify as the holder of a secured claim to some extent as determined by § 506(a).' " *Id.* (quoting *In re Plouffe*, 157 B.R. 198, 200 (Bankr.D.Conn.1993)). "*Nobelman's* reference to section 506(a) is 'meaningless unless some portion of the claim must be secured under § 506(a) analysis before the creditor is entitled to retain the rights it has under state law.' " *Id.* (quoting *In re Williams*, 161 B.R. 27, 29–30 (Bankr.E.D.Ky. 1993)). This conclusion is consistent with the legislative history, reflecting congressional intention to protect home mortgage lenders, that "because second mortgagees are not in the business of lending money for home purchases, the same policy reasons for protection of first mortgagees under section 1322(b)(2) do not exist for second mortgagees." *Id.* at 41.

The majority of courts have agreed that strip off of wholly unsecured liens is permissible. *See, e.g., In re Purdue*, 187 B.R. 188 (S.D.Ohio 1995); *Wright v. Commercial Credit Corp.*, 178 B.R. 703 (E.D.Va.1995); *In re Libby*, 200 B.R. 562 (Bankr.D.N.J.1996); *In re Lee*, 177 B.R. 715 (Bankr.N.D.Ala. 1995); *In re Thomas*, 177 B.R. 750 (Bankr. S.D.Ga.1995); *In re Castellanos*, 178 B.R. 393 (Bankr.M.D.Pa.1994); *In re Mitchell*, 177 B.R. 900 (Bankr.E.D.Mo.1994). *See In re Barnes*, 207 B.R. at 592 for other cases. *See also* 8 Lawrence P. King, Jr., Collier on Bankruptcy, ¶ 1322.06[1][a][i] at 1322–21 (15th Rev.Ed.1997) ("The Nobleman opinion strongly suggests ... that if a lien is completely undersecured, there would be a different result. The opinion relies on the fact that, even after bifurcation, the creditor in the case was 'still the "holder" of a "secured claim" because petitioners' home retain[ed] $23,000 of value as collateral.' ")

Recently a second line of cases has developed which declines to allow the debtor to strip off wholly undersecured liens. The Association urges us to follow this line of cases.

In *In re Barnes*, 207 B.R. 588 (N.D.Ill. 1997), the court acknowledged the number of cases allowing strip down of a wholly undersecured lien, but declined to adopt the "still the holder" dicta of *Nobelman*. The court pointed out that:

If § 1322(b)(2)'s protection against modification were limited solely to security interests with underlying collateral, junior mortgagees with a single penny of equity in collateral in the debtor's principal residence would still retain complete protection from a stripdown while junior mortgagees who lacked that penny of equity would find their entire claim stripped off. Nobleman did not foster this absurd result because that decision did not delineate that any level of equity protecting the secured creditors is required for § 1322(b)(2) protection. Instead, *Nobelman* flatly held that "[s]ection 1322(b)(2) prohibits [a

§ 506(a) ] modification where, as here, the lender's claim is secured only by a lien on the debtor's principal residence."

*Id.* at 593 (quoting *Nobelman,* 508 U.S. at 332, 113 S.Ct. at 2111). The court discounted the concurring opinion in *Nobelman,* which referred to § 1322(b)(2)'s policy of protecting the home lending market as not being reflected in either the majority opinion or the actual statute. *Id. Barnes* concluded that "[u]ntil Congress chooses to limit § 1322(b)(2) in some way, all mortgagees holding security interests in a debtor's principal residence receive protection against any modification of their rights, and may receive increased economic protection of their interest from growing real estate value over the three to five year life of the Plan. Should that value rise, the creditor stands to benefit thereby, and the debtor may not capture such increase in value through a § 506(a) stripoff." *Id.* at 594.

Other courts have agreed that strip off is not permissible. *See, e.g., In re Neverla,* 194 B.R. 547 (Bankr.W.D.N.Y.1996) (literal and functional interpretation of statute prohibits modification irrespective of value); *In re Jones,* 201 B.R. 371 (Bankr.D.N.J.1996). *See also* 1 KEITH M LUNDIN, CHAPTER 13 BANKRUPTCY § 4.46 at 4–56 (2d ed. 1994) ("The clear implication of this analysis is that even a completely unsecured claim holder 'secured' only by a lien on real property that is the debtor's principal residence would be protected from modification by § 1322(b)(2), notwithstanding that such an 'unsecured' lienholder could not have an allowable secured claim under § 506(a).").

We agree with the analysis provided by Judge Schmetterer in *In re Barnes* and Judge Stripp in *In re Jones.*

A court analyzing a 'stripoff' situation in Chapter 13, therefore, should look first to whether the creditor holds a mortgage secured only by the debtor's principal residence. If so, the creditor's rights under § 1322(b)(2) may not be modified regardless of the presence or absence of underlying equity in the residence, and there is no right to look to § 506(a) for valuation. A mortgage stripoff epitomizes a modification of creditor rights and is not allowed in Chapter 13 under § 1322(b)(2) and Nobelman.

207 B.R. at 592. "The trigger for Justice Thomas's protection of rights analysis [in *Nobelman* ] is the existence of a lien, not the presence of value to support that lien." LUNDIN, § 4.46 at 4–56. The *Nobelman* court specifically rejected the debtor's argument that the application of § 1322(b)(2) depends first on a § 506(a) assessment "to determine the value of the mortgagee's 'secured claim' ". 508 U.S. at 328, 113 S.Ct. 2106. Rather, as Judge Stripp recognized in *Jones,* "the existence of a mortgage lien . . . determines the application of § 1322(b)(2), and not the value of the collateral subject to that lien." 201 B.R. at 374.

■ To the extent that the debtor is seeking to strip off the Association's lien, which is secured only by the debtor's principal residence, the debtor's action is proscribed by application of § 1322(b)(2). In this regard, we note that there is some question as to the extent that the Association's lien is valid. The lien filed by the Association was in the amount of $705.85 for amounts due through November 20, 1995. The notice of lien includes a statement that: "Additional charges, including, but not limited to additional assessments, interest, attorney fees and costs of collection, may hereafter accrue and shall be added to the amount due until fully paid and satisfied." This statement, to the extent that it was intended to create a lien that would be augmented by subsequent delinquencies, appears to contradict both the Association's By–Laws and N.J.S.A. 46:8B–21. N.J.S.A. 46:8B–21 provides in relevant part:

The association shall have a lien on each unit for any unpaid assessment duly made by the association for a share of common expenses or otherwise, together with interest thereon and, if authorized by the master deed or by-laws, reasonable attorney's fees. Such lien shall be effective from and after the time of recording in the public records of the county in which the unit is located of a claim of lien stating the description of the unit, the name of the record owner, the amount due and the date when due. *Such claim of lien shall include only sums which are due and pay-*

*able when the claim of lien is recorded and shall be signed and verified by an officer or agent of the association.*

N.J.S.A. 46:8B–21 (emphasis added). The Association's lien is valid only as to the amount due at the time it was recorded, here, $705.85. We have no evidence in the record that the Association obtained a lien for any of the other prepetition amounts due and owing. Accordingly, these amounts must be viewed as unsecured claims.

■ Parenthetically, it should be noted that the Association is correct to contend that the debtor retains responsibility to pay post-petition condominium assessments as they are due. *See* 11 U.S.C. § 503(b).

We conclude that to the extent the condominium association holds a lien against debtor's property, i.e., $705.85, the security interest of the Association cannot be reclassified to unsecured status, regardless of the value of debtor's property. Debtor's motion to reclassify is granted to the extent that the remainder of the Association claim may be designated as unsecured.

Debtor's counsel shall submit an order in conformance herewith.