**In re Pamela L. TANNER, Debtor.**

**Pamela L. TANNER, Plaintiff,**

v.

**FIRSTPLUS FINANCIAL INC. (f/k/a Remodelers National Funding), Defendant.**

**Bankruptcy No. 97–07652–6B3. Adversary No. 97–00404.**

United States Bankruptcy Court, M.D. Florida, Orlando Division.

July 7, 1998.

**380**

Douglas W. Neway, Orlando, FL, for Debtor.

Dianne S. Tronolone, Plantation, FL, for FirstPlus Financial, Inc.

## MEMORANDUM OPINION

ARTHUR B. BRISKMAN, Bankruptcy Judge.

This matter came before the Court on Motion by FirstPlus Financial Inc., to Dismiss Debtor's, Pamela L. Tanner, Complaint for Failure to State a Claim Upon Which Relief can be Granted (Doc. 7). Appearing before the Court were Douglas W. Neway, attorney for Plaintiff/Debtor, Pamela L. Tanner; and Dianne S. Tronolone, attorney for Defendant, FirstPlus Financial Inc. After reviewing the pleadings, evidence, exhibits, and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Pamela L. Tanner ("Debtor") filed for relief under Chapter 13 of the United States Bankruptcy Code on September 17, 1997. 11 U.S.C. § 101 *et seq.* The Debtor's principal residence has a value of $62,000.00 with a first mortgage by Inland Mortgage in the amount of $62,880.01, and a second mortgage by FirstPlus Financial, Inc., ("FirstPlus") in the amount of $22,986.65. The Debtor and FirstPlus stipulate the value of the real estate is less than the first mortgage. No other collateral is secured by FirstPlus.

The Debtor's sixty-month Chapter 13 Plan (the "Plan") proposes to pay Inland's first mortgage in full with $709.00 per month payments. The Plan treats FirstPlus's claim as an unsecured claim. Unsecured creditors under the Debtor's proposed Plan would receive approximately a six-percent dividend.

The Debtor filed an adversary complaint against FirstPlus (Doc. 19; Adv. Doc. 1), seeking to "strip off"[1] FirstPlus's unsecured second mortgage pursuant to 11 U.S.C. § 506(a) because the value of her principal residence is less than the first mortgage. FirstPlus filed its Motion to Dismiss Complaint for Failure to State a Claim (Adv. Doc. 7) based upon its mortgage lien on the Debtor's principal residence is protected from modification pursuant to 11 U.S.C. § 1322(b)(2).

### CONCLUSIONS OF LAW

 The issue is whether it is permissible for the Debtor to strip off FirstPlus's unsecured second mortgage on her primary residence pursuant to 11 U.S.C. § 506(a) despite the prohibition against modification set forth in 11 U.S.C. § 1322(b)(2). The answer is in the negative after considering *Nobelman's* clear pronouncement regarding a mortgagee's "rights" under state law and proper interpretation between §§ 506(a) and 1322(b)(2) of the Bankruptcy Code.

The Debtor seeks to avoid FirstPlus's unsecured mortgage lien pursuant to § 506(a). Section 506(a) provides, in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim. *Id.*

Section 506(a) allows for a secured claim to undergo a valuation analysis to determine how the claim relates to the underlying col-

---

1. The term "strip off" refers to complete lien avoidance pursuant to 11 U.S.C. § 506(d) where a junior mortgagee is unsecured in a Chapter 13 case, whereas the term "strip down" refers to a partial lien avoidance where a mortgagee is partially secured and partially unsecured.

lateral. Its provisions are of general applicability in cases under Chapter 7, 11, 12 and 13 of the Bankruptcy Code. 11 U.S.C. § 103(a); *see also In re Chavez*, 117 B.R. 733 (Bankr. S.D.Fla.1990). This section permits bifurcation of a secured claim into its secured and unsecured component according to the value of the security.

In a chapter 13 plan, § 1322(b)(2) has limiting effects on possible valuation outcomes. Section 1322(b)(2) provides that the plan may also "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ..." *Id.* Thus, secured rights in real estate may be modified in chapter 13, except where it involves the debtor's principal residence.

*Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) considered the issue of whether § 1322(b)(2) bars the removal of the unsecured portion of an undersecured claim from a chapter 13 debtor's residence. "[Section] 1322(b)(2) prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence." *Nobelman*, 508 U.S. at 325, 113 S.Ct. 2106.

In reaching its holding, *Nobelman* noted that § 1322(b)(2) "does not state that a plan may modify 'claims' or that the plan may not modify 'a claim secured only by' a home mortgage. **Rather, it focuses on the modification of the 'rights of holders of such claims.'** " *Id.* at 328, 113 S.Ct. 2106 (emphasis added). Nobelman recognized that Congress "left the determination of property rights in the assets of a bankrupt's estate to state law...." since "rights" are not defined in the Code. *Id.* at 329, 113 S.Ct. 2106.

The rights of an undersecured creditor included the right to repayment over the term of the loan, to retain the lien until full payment is made, to accelerate and foreclose on the residence if the debtor defaults on its payments, and to recover any deficiency after foreclosure. "These are the rights that were 'bargained for by the mortgagor and mort-

gagee,' and are rights protected from modification pursuant to § 1322(b)(2)." *Id.* at 329–30, 113 S.Ct. 2106.

The Debtor contends that since FirstPlus is not a "holder of a secured claim" it does not come within the ambit of § 1322(b)(2) despite *Nobelman's* expansive definition of "rights." She contends pursuant to § 506(d) FirstPlus's mortgage lien is void "to the extent that a lien secures a claim against the debtor that is not an allowed secured claim[.]" *Id.*

Many courts have wrestled with the issue of whether the anti-modification provision under § 1322(b)(2) permits a debtor to strip off an unsecured mortgage on a primary residence since *Nobelman*. Those in favor in allowing modification of an unsecured mortgage lien have looked first to § 506(a) for valuation of the creditor's claim. *See In re Lam*, 211 B.R. 36 (9th Cir. BAP 1997); *Wright v. Commercial Credit Corp.*, 178 B.R. 703 (E.D.Va.1995); *In re Sanders*, 202 B.R. 986 (Bankr.D.Neb.1996); *In re Purdue*, 187 B.R. 188 (S.D.Ohio 1995); *In re Lee*, 177 B.R. 715 (Bankr.N.D.Ala.1995); *Norwest Financial Georgia, Inc. v. Thomas (In re Thomas)*, 177 B.R. 750 (Bankr.S.D.Ga.1995); *In re Woodhouse*, 172 B.R. 1 (Bankr.D.R.I. 1994); *In re Lee*, 161 B.R. 271 (Bankr. W.D.Okla.1993); *In re Williams*, 161 B.R. 27 (Bankr.E.D.Ky.1993); *In re Kidd*, 161 B.R. 769 (Bankr.E.D.N.C.1993); *In re Hornes*, 160 B.R. 709 (Bankr.D.Conn.1993); *In re Plouffe*, 157 B.R. 198 (Bankr.D.Conn.1993).

These courts have relied on *Nobelman's* language for the proposition that parties may look to § 506(a) "for a judicial valuation of the collateral to determine the status of the bank's secured claim." *Nobelman*, 508 U.S. at 328–329, 113 S.Ct. 2106. The courts have interpreted this language to mean they must first look to § 506(a) to determine whether the claimant holds a secured or an unsecured claim before the application of § 1322(b)(2). These courts conclude that § 1322(b)(2) does not apply and the Debtor may strip off the lien from the property if the second mortgage is unsecured.[2]

---

**2.** Collier has also adopted this approach:

The *Nobelman* opinion strongly suggests ... that if a lien is completely undersecured, there

The Debtor's attempt to strip off a second mortgage even if the claim is unsecured has been denied by other courts. *In re Bauler*, 215 B.R. 628 (Bankr.D.N.M.1997); *In re Mattson*, 210 B.R. 157 (Bankr.D.Minn.1997); *In re Shandrew*, 210 B.R. 829 (Bankr. E.D.Cal.1997); *In re Fraize*, 208 B.R. 311 (Bankr.D.N.H.1997); *In re Jones*, 201 B.R. 371 (Bankr.D.N.J.1996); *In re Barnes*, 199 B.R. 256 (Bankr.W.D.N.Y.1996); *In re Neverla*, 194 B.R. 547 (Bankr.W.D.N.Y.1996).

These courts have determined the emphasis *Nobelman* placed on the "rights" of the home mortgage creditor cannot be ignored. It is the existence of a mortgage lien that is crucial in the application of § 1322(b)(2), not the value of the residence subject to the lien.[3] *In re Bauler*, 215 B.R. at 632.

■ *Nobelman* and § 1322(b)(2) do not allow the Debtor to strip off FirstPlus's mortgage lien. The plain meaning of § 1322(b)(2) prohibiting modification of "a claim secured only by a security interest in real property" shows Congress's intent to except the "claim" from modification. The language could have easily said, "except for a secured claim ..." but instead refers to a "claim." *In re Fraize*, 208 B.R. at 313; *see also In re Barnes*, 207 B.R. 588, 593 (Bankr.N.D.Ill.1997) ("If Congress intended prohibition against modification in § 1322(b)(2) to be limited to only

certain mortgages, it could have drafted the section to reflect the limitation."). "When the language of a statute is clear and unambiguous and conveys a clear and definite meaning, the statute must be given its plain and ordinary meaning." *Mike Smith Pontiac, GMC, Inc. v. Mercedes–Benz of North America, ·Inc.*, 32 F.3d 528, 531 (11th Cir. 1994). The prohibition against claim modification protects both unsecured and secured encumbrances on the Debtor's home.

The expansive definition of "rights" afforded to secured creditors under Florida law, even without equity in the mortgaged property, protects the mortgagee from modification pursuant to *Nobelman*. A mortgage instrument creates a lien in favor of the mortgagee. FLA.STAT. § 697.02 ("A mortgage shall be held to be a specific lien on the property therein described, and not a conveyance of the legal title or of the right of possession."). Creation of this interest is not dependent on the existence of equity in the property.[4] The "rights" of mortgagees include the right to repayment over the term of the loan and to retain the lien until full payment is made to the secured lender. The right to conduct foreclosure proceedings is not limited solely to the value or equity remaining on the land if a debtor defaults on payment.[5]

---

would be a different result. The opinion relies on the fact that, even after bifurcation, the creditor in the case was "still the 'holder' of a 'secured claim' because petitioners' home retain[ed] $23,000 of value as collateral." If the creditor had held a lien on property that had no value (perhaps because the property was fully encumbered by prior liens), then under this analysis it would not have been a "holder of a secured claim" entitled to protection by section 1322(b)(2). 5 Collier on Bankruptcy, § 1322.06[1][a] at 1322–16 (L. King 15th Ed.1989).

3. *See also* Keith M. Lundin, Chapter 13 Bankruptcy § 4.46, p. 4–56 (2nd ed. 1994) ("Although the bank's claim in *Nobelman* was partially secured by real property that was the debtor's principal residence, Justice Thomas's analysis ties the protection from modification in § 1322(b)(2) to the existence of a 'claim' secured by a lien on real property, without regard to whether the claim holder would also have an allowed secured claim after valuation and analysis under § 506(a). The clear implication of this analysis is that even a completely unsecured claim holder 'secured' only by a lien on real

property that is the debtor's principal residence would be protected from modification by § 1322(b)(2), notwithstanding that such an 'unsecured' lienholder could not have an allowable secured claim under § 506(a).... In other words, the trigger for Justice Thomas's protection of rights analysis is the existence of a lien, not the presence of value to support that lien.")

4. FLA.STAT. § 697.01(1) provides:

"[a]ll conveyances, obligations conditioned or defeasible, bills of sale of other instruments of writing conveying or selling property, either real or personal, for the purpose or with the intention of securing the payment of money ... shall be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in relation to mortgages." *Id.*

5. Judge Lundin precisely recognizes this point:

"[E]ven a mortgage holder with little or no 'value' in the collateral to support its debt has a 'right' to foreclose its lien and sell the prop-

Uniform treatment regarding the creation and maintenance of security interests in bankruptcy serves to reduce uncertainty, discourages forum shopping and prevents a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). These justifications apply with equal force in support of Florida's state law interest regarding a mortgagee's "rights" in bankruptcy even when a lien is unsecured.

There are clear inconsistencies in the application of § 1322(b)(2) when a mortgagee is unsecured no matter what approach is adopted. If a strip off is not permitted, a creditor will have greater rights in bankruptcy than those bargained for under state law. Indeed, FirstPlus's unsecured mortgage will be fixed as a secured claim elevating it to a fully secured status under the Bankruptcy Code. However, if FirstPlus exercised its "rights" in a non-bankruptcy forum, its "rights" would be inferior to those of a senior mortgage lien and its claim would be extinguished upon foreclosure. This may encourage junior mortgagees to obtain a mortgage on property that is already overburdened with senior mortgagees for the sole purpose of avoiding modification of prepetition contractual rights. *See, e.g. In re Lam*, 211 B.R. at 41.

Likewise, there are incongruities if modification of an unsecured mortgage creditor is allowed. Too much emphasis would also be placed on the valuation of the Debtor's residence and this could yield absurd results. *See, e.g. In re Fraize*, 208 B.R. at 313. The critical factor for purposes of defining strip off will not be a mortgagee's rights under the contract but valuation outcomes in bankruptcy. A one-dollar differential in a debtor's property value might lead to greater protection from modification by those receiving favorable valuation treatment. Cases may turn on an arbitrary or unscientific valuation and not the bargained for rights under the mortgage.

The Eleventh Circuit Court of Appeals nor any federal circuit court has addressed the divergent application of *Nobelman* and § 1322(b)(2) to unsecured mortgage creditors. Recognizing no binding authority has spoken to the contrary on this issue, the better view based upon a literal reading of § 1322(b)(2) and *Nobelman's* focus on rights prohibits the Debtor from avoiding First-Plus's unsecured mortgage lien. *Nobelman's* decision that § 1322(b)(2) bars a Chapter 13 Plan from modifying the "rights" of holders of undersecured claims applies with equal force to unsecured mortgages on the Debtor's principal residence. Accordingly, First-Plus's Motion to Dismiss the Complaint is due to be granted.

### JUDGMENT

The Defendant's, FirstPlus Financial Inc. ("FirstPlus"), Motion to Dismiss Complaint for Failure to State a Claim Upon Which Relief can be Granted (Doc. 7), having been tried before the Court and in conformity with and pursuant to the **Memorandum Opinion** entered contemporaneously herewith, it is

**ORDERED, ADJUDGED, and DECREED** that the Defendant's Motion to Dismiss Plaintiff's, Pamela L. Tanner, Complaint to determine the value of FirstPlus's security and secured claim is due to be **GRANTED;** and it is further

**ORDERED, ADJUDGED, and DECREED** that the Plaintiff's Complaint to determine the value of FirstPlus's security and secured claim is hereby **DISMISSED.**

---

erty. The 'unsecured' lienholder may not receive any proceeds from such a foreclosure sale, but it has the 'right' to force such a sale and to avail itself of whatever strategic advantages it may accomplish under its contract with the debtor and under state law." Keith M. Lundin, Chapter 13 Bankruptcy, § 4.46, at 4–56 to 4–57.