**In re Karen Grace ABRUZZO, Debtor.**

**Bankruptcy No. 99–14011DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Nov. 9, 1999.

Irwin Trauss, Philadelphia Legal Assistance, Philadelphia, PA, for Debtor.

Michael A. Cataldo, Cibik & Cataldo, Philadelphia, PA, for S & S Family Partnership.

Edward Sparkman, Philadelphia, PA, for Chapter 13 Trustee.

Dave P. Adams, Philadelphia, PA, for United States Trustee.

## MEMORANDUM OPINION

DIANE WEISS SIGMUND,
Bankruptcy Judge.

Before the Court is a motion (the "Motion") filed by Karen Grace Abruzzo (the "Debtor") under 11 U.S.C. § 506(a) and Bankruptcy Rule 3012 to value the interest of her mortgagee, S & S Family Partnership ("S & S"), in the estate's interest in Debtor's residential real property (the "Property") described as a row home located at 2423 South Hicks Street, Philadelphia, Pennsylvania. The Debtor asserts that the Property is worth $35,000, but nevertheless posits that S & S is completely undersecured by virtue of being subordinate to several other liens greater in value than the Debtor's interest in the Property. As such, Debtor proposes to pay S & S nothing on account of its secured claim. S & S disagrees with the Debtor's valuation, suggesting instead that the Property is worth up to $50,000, and,

in addition, argues that its lien is protected from avoidance under 11 U.S.C. § 1322(b)(2), the so-called "anti-modification clause."

Upon review, I conclude that S & S holds two mortgages on the Property, neither of which is subject to modification. Contrary to the Debtor's contentions, based on the record presented, the mortgages only secure an interest in real estate and may not be modified. Since I also find that the anti-modification clause is intended to protect a holder of a claim secured by residential real estate without regard to its value, Debtor's alternate basis for seeking to "strip off"[1] S & S's lien is rejected. Moreover, since I conclude that S & S's secured claim is not subject to bifurcation, no valuation of the Property is required. Likewise, given my conclusions herein, Debtor's pending adversary proceeding against S & S, Adversary Proceeding No. 99–802, is moot to the extent that it seeks to have S & S's lien avoided pursuant to § 506(d).[2]

**BACKGROUND**

The Debtor filed a Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code on March 3, 1999. At the time, Debtor was married to Thomas Abruzzo ("Mr. Abruzzo"), but a divorce proceeding was pending and on April 28, 1999, their divorce was finalized. Divorce Decree, Exhibit D–4.

The Debtor owns the Property with her former husband Mr. Abruzzo.[3] S & S holds two mortgages, dated November 17, 1988 (the "1988 Mortgage") and June 25, 1991 (the "1991 Mortgage"),[4] respectively which secure a filed claim in the amount of $63,019. Exhibit D–14. The Property is subject to a number of liens prior to the mortgages held by S & S. Exhibit D–8 evidences a proof of claim filed by First Union National Bank as Trustee for the Philadelphia Authority of Industrial Development ("PAID"). The claim identifies PAID as the holder by assignment of a secured claim in the amount of $12,049.97 on account of delinquent property taxes. Exhibit D–9 evidences a secured claim filed by the City of Philadelphia for additional delinquent property taxes in the amount of $3,431.03 and for a water and sewer bill of $954.64. Exhibit D–12 evidences a municipal claim filed by the City of Philadelphia as a lien to secure payment for a delinquent gas bill of $846.13.[5]

1. Strip off (the entire lien) and "strip down" (the lien on the unsecured component leaving the reduced secured claim) are the commonly employed terms to describe the result of the claim bifurcation and lien avoidance that occur under § 506(a) and (d).

2. Notably Debtor was seeking an Order avoiding S & S's lien on the Property notwithstanding that this bankruptcy proceeding could not affect the creditor's rights as against the codebtor/former spouse. *In re Yorke*, 1996 WL 509614 (Bankr.E.D.Pa. Sept. 4, 1996). This position is totally at odds with Debtor's other premise, *i.e.*, that only Debtor's half interest is considered in this proceeding. Were S & S's liens against the Debtor's interest subject to strip off, the liens clearly remain with respect to the other mortgagor.

3. The Debtor testified that she and Thomas, who is presently incarcerated, have no agreement as to the equitable division of this marital asset in which she resides.

4. S & S acquired the mortgages by assignment from Carmen D'Amato and Nicholas D'Amato, the named mortgagees in both instruments. S & S did not present any evidence that explained the significance, if any, of holding two mortgages; rather it asserted its one claim as secured by both. Since my legal conclusion with respect to cramdown of the mortgages is the same, this ambiguity need not be addressed.

5. Debtor's evidence of prior liens equal to $19,303.07 purportedly does not include the amounts evidenced in Exhibit D–13, a gas bill showing a balance as of May 5, 1999, of $2,183.37. and Exhibit D–11, a printout purportedly from the Philadelphia Water Department showing an additional water and sewer debt in the amount of $2,021.30. It appears to me that Debtor's total of $19,303.07 does include the "unliened" Exhibit D–11 amounts, and S & S may not be totally unsecured if the liens rather total $17,281.77. However, I have accepted Debtor's premise regarding the amount of the prior liens for the purpose of addressing the dispositive legal issue she presses, *i.e.*, that the lien of a totally unsecured mortgagee can be stripped off.

These exhibits document the existence of municipal claims totaling $17,271.77 having lien priority superior to the mortgages held by S & S.

Both parties also presented expert valuation testimony. Based on her appraisal, the Debtor contends the Property is worth $35,000, Exhibit D–1. Based on this appraisal, the Debtor concludes that her interest in the Property is without value since the above-described municipal claims of $19,303.07 are greater than the value of her one-half interest in the Property which she values at $17,500. Presumably were I to agree with her position and find in her favor herein, the Debtor will have advanced her ultimate goal of avoiding S & S mortgages under 11 U.S.C. § 506(d).[6] The Debtor, however, recognizes that the anti-modification clause of 11 U.S.C. § 1322(b)(2) may pose an impediment to such avoidance. While viewing this to be a confirmation issue, she nonetheless addresses the point which S & S has raised in response to the Motion,[7] arguing that the mortgages may be modified because they are secured by personal property in addition to real estate and/or the claim is totally unsecured.

## DISCUSSION

As noted above, Debtor seeks a determination that S & S has no secured claim within the meaning of § 506(a). This section provides, in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is secured to the extent of the value of such creditor's interest in the estates' interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest.... is less than the amount of such allowed claim.

11 U.S.C. § 506(a). Debtor contends that she is permitted to modify S & S's claim under § 506(a) because the anti-modification clause of § 1322(b)(2) does not protect S & S's rights. Section 1322(b)(2) provides that a Chapter 13 plan can "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]" 11 U.S.C. § 1322(b)(2).[8]

By the plain language of § 1322(b)(2), modification of the rights of a mortgagee is permissible where a mortgage is secured by property other than solely the real property that is the debtor's principal residence. *Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123, 128–29 (3d Cir.1990). Debtor contends that modification of S & S's rights is permissible because S & S has a security interest in property in addition to her Residence.

Debtor further asserts that she is entitled to modify S & S's rights under § 506(a) because its claim is wholly unsecured. In *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), the Supreme Court held that the anti-modification clause in § 1322(b)(2) prohibits a Chapter 13 debtor from utilizing § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence. However, the Supreme Court in *Nobelman* did not discuss whether the protection afforded by § 1322(b) extends beyond partially secured homestead mortgagees to homestead mortgagees whose claim would be wholly unsecured under a § 506(a) valuation. Since *Nobelman*, two

---

**6.** As mentioned above, Debtor filed an adversary proceeding seeking this relief.

**7.** Because the anti-modification clause is a barrier to bifurcation of a secured claim, there is no legal relevance to the valuation determination if the secured claim cannot be modified. In the interests of judicial econo-

my that threshold issue, raised by S & S, is properly before the Court at this time.

**8.** Chapter 13 debtors are required to formulate a payment plan consistent with the requirements of § 1322(a) and the guidelines of § 1322(b).

different views have emerged on the issue. The majority view is that the anti-modification clause in § 1322(b)(2) does not apply to mortgagees who hold totally unsecured claims. *See e.g., Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36 (9th Cir. BAP 1997), *appeal dismissed* 192 F.3d 1309 (9th Cir.1999); *Yi v. Citibank (In re Yi)*, 219 B.R. 394 (E.D.Va.1998); *In re Cervelli*, 213 B.R. 900 (Bankr.D.N.J.1997). The minority view is that mortgagees' rights may not be modified even if their claims are wholly unsecured. *See e.g., American General Finance, Inc. v. Dickerson*, 229 B.R. 539 (M.D.Ga.1999); *In re Perry*, 235 B.R. 603, 604–608 (S.D.Tex.1999); *In re Jones*, 201 B.R. 371, 371–375 (Bankr.D.N.J.1996); *In re Neverla*, 194 B.R. 547 (Bankr.W.D.N.Y. 1996). Debtor urges me to adopt the majority view.

### A.

The issue of whether mortgages secure property other than residential real estate has been the subject of numerous court decisions, including a series of Third Circuit opinions, both pre- and post *Nobelman*, which hold that the existence of a security interest in personal property removes a mortgage from protection of the anti-modification clause and clears the path for the mortgage to be avoided to the extent it is undersecured. These decisions recognize that the anti-modification clause is narrowly drawn to apply to mortgages that secure only interests in real estate, as opposed to interests in personal property, and proceed to analyze the security granted to the mortgagee to determine whether the anti-modification clause has been preserved or forfeited by the existence of some additional collateral. *Johns v. Rousseau Mortgage Corp. (In re Johns)*, 37 F.3d 1021, 1024 (3d Cir.1994) (bifurcating

claim where additional security interest in appliances, machinery, furniture, and equipment, whether fixtures or not); *Hammond v. Commonwealth Mortgage Corp. (In re Hammond)*, 27 F.3d 52, 56 (3d Cir.1994) (bifurcating claim where additional security interest in appliances, machinery, furniture and equipment (whether or not fixtures)); *Sapos v. Provident Institution of Savings*, 967 F.2d 918, 925 (3d Cir.1992) (bifurcating claim where security interest in household appliances, wall-to-wall carpeting, rents, profits and appliances); *Wilson, supra*, 895 F.2d at 128–29 (bifurcating claim where additional security interest in appliances, machinery, furniture and equipment (whether or not fixtures)).[9] As resolution of this legal question requires a careful examination of the items of security granted by the mortgage, I will turn to S & S's mortgages now for that purpose, addressing the parties' contentions on whether any such collateral is of a nature to bring the mortgage outside the protection of the anti-modification clause.

■ *1988 Mortgage.* The first provision on which the Debtor relies to show that the mortgage extends to items of personal property is the appurtenance clause on the third page of the 1988 Mortgage which conveys, *inter alia*,

> Rents, Issues and Profits thereof and also together with the plumbing, heating and lighting equipment, or machinery, now or hereafter installed upon the above described premises notwithstanding any of such are capable of severance without harm to the real estate.

The Debtor did not, however, introduce evidence of the actual existence of any of these items of property. The Debtor's failure to introduce such evidence raises a threshold legal issue of whether the scope

---

**9.** While holding in *Nobelman* that the anti-modification clause applied in Chapter 13 to an undersecured mortgagee, the Supreme Court has never addressed the arguments presented by the Debtor to avoid its application here. Consequently, while *Nobelman* overruled the Third Circuit's decisions in *Wilson* and *Sapos* to the extent they held that the anti-modification did not protect mortgagees with partially secured claims, their alternate holdings regarding the exception to the anti-modification clause for mortgages that contain personal property collateral are still good law. *Hammond*, 27 F.3d at 53.

of the mortgagee's security interest should be judged solely from the face of the mortgage or whether I am required to look behind the written mortgage document to determine whether the identified collateral actually exists.

The resolution of this question is suggested by the Third Circuit in *Wilson* where the Court pointedly distinguished the case relied upon by the mortgagee, *Matter of Foster*, 61 B.R. 492 (Bankr. N.D.Ind.1986). In *Foster*, the court held that a security interest in valueless property beyond the realty does not bring the mortgage outside the anti-modification provisions of § 1322(b)(2). Those facts, the Court of Appeals noted, did not obtain in *Wilson* where the additional security in that case—furniture and appliances—had value. 895 F.2d at 129.[10] These comments imply that the actual existence of personal property collateral is necessary for a mortgage to be removed from the anti-modification clause and courts have so held. *See In re Toms*, Bankr.No. 97–30177F (Bankr.E.D. Pa. April 7, 1998) (concluding that although mortgage contained language granting the mortgagee a security interest in improvements, easements, rents and appurtenances, since no such property existed at the inception of the debtor's Chapter 13 case, the mortgagee possessed a security interest only in

property that was the debtor's principal residence); *In re French*, 174 B.R. 1, 7 (Bankr.D.Mass.1994) (ruling that mortgage's inclusion of a security interest in "deposits" did "not result in a forfeiture of the anti-modification provisions of § 1322(b)(2) because no such deposits existed at the time of the commencement of the case."); *In re Williams*, 109 B.R. 36, 39 (Bankr.E.D.N.Y.1989) (collateral with nominal value not considered under § 1322(b)(2)).[11]

■ This conclusion is supported by an analysis of applicable state law which in just about all instances is the appropriate place to turn to define the operation of property rights in bankruptcy. *Nobelman, supra*, 508 U.S. at 329, 113 S.Ct. 2106; *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).[12] Under state law, a security interest cannot attach and become enforceable as to property in which the debtor does not have an interest. 13 Pa.C.S. § 9203. Clearly if property does not exist, the debtor can have no rights as to which a security interest can attach. Accordingly, a mortgagee will not have a security interest in property which the debtor does not own notwithstanding that its mortgage on its face purports to take such an interest.

---

**10.** In a footnote, the *Wilson* court observed that the mortgagee in the case was not disputing the asserted existence of personal property collateral. *Id.* at 126 n. 1. On that basis the court then distinguished *Wilson* from a previous case, *In re Lewis*, 875 F.2d 53 (3d Cir. 1989), where the debtor conceded that the mortgagee lacked a security interest in personal property.

**11.** I note that two judges in this Circuit, also relying on *Wilson*, have articulated the opposite view, holding that the search for personal property collateral need not go beyond the face of a mortgage. *In re Libby*, 200 B.R. 562, 567–68 (Bankr.D.N.J.1996); *In re Pinto*, 191 B.R. 610, 613 (Bankr.D.N.J.1996). They focus on the *Wilson* Court's statement that a creditor's "subjective desire to obtain an interest in property" is irrelevant to whether its mortgage is protected under § 1322(b)(2).

The statement in *Wilson* regarding a creditor's subjective intent is better read as a response to the creditor's argument that it had taken no steps in furtherance of its grant of additional security in personal property. Its lack of desire to obtain a security interest as evidenced by its failure to file financing statements was deemed irrelevant to the fact that it had indeed acquired a lien on actual additional personal property by reason of its financing documents.

**12.** As stated in *Butner, supra*,

Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

440 U.S. at 55, 99 S.Ct. 914.

The Debtor made no record here that established that she had any rights in any of the items of property enumerated in the mortgages that form the basis of her additional collateral argument. Rather she relies on her belief that the Third Circuit has rejected the argument that valueless security interests should be ignored. In support she points to *Hammond*, 27 F.3d at 56–57. In so doing, she has taken the Court's statements out of their intended context. The *Hammond* Court was responding to the mortgagee's argument that it should overrule the alternative and still viable holding that the existence of personal property collateral will remove the protection of the anti-modification clause because the additional security provided for was "meaningless standard language." [13] Rather the Court reaffirmed its conclusion in *Wilson* that § 1322(b)(2) plainly states that a mortgagee with an additional security interest gets no protection from the anti-modification clause.

▮ Even could I assume, as did the bankruptcy court in *Wilson* with respect to furniture and appliances, that the Debtor did own some items of plumbing, heating or lighting equipment, the outcome would be the same with respect to these items of security contained in the 1988 Mortgage. While the interpretation of § 1322(b)(2) is a matter of federal law, state law provides the rule of decision for distinguishing real property from personal property. *See e.g., Nobelman, supra; In re Rosen,* 208 B.R. 345, 350 (D.N.J.1997); *Steslow v. Citicorp Mortgage, Inc. (In re Steslow),* 225 B.R. 883, 884–85 (Bankr.E.D.Pa.1998); *Rodriguez v. Mellon Bank, N.A. (In re Rodriguez),* 218 B.R. 764, 775–76 (Bankr.E.D.Pa. 1998). Under Pennsylvania law, personal property falls into three categories in relationship to real estate:

First, those which are manifestly furniture, as distinguished from improvements, and not peculiarly fitted to the property with which they are used; these always remain personalty.... Second, those which are so annexed to the property that they cannot be removed without material injury to the real estate or to themselves; these are realty, even in the face of an expressed intention that they should be considered personalty— to them the ancient maxim 'Quicquid plantatur solo, solo cedit,' applies in full force....Third, those which, although physically connected with the real estate, are so affixed as to be removable without destroying or materially injuring the chattels themselves, or the property to which they are annexed; these become part of the realty or remain personalty, depending upon the intention of the parties at the time of the

---

**13.** The security interests in *Wilson* and *Hammond* were the same, *i.e.,* furniture, appliances machinery and equipment, and the *Hammond* Court found the case "on all fours" with *Wilson*. *Id.* at 55, 99 S.Ct. 914. In *Wilson,* the Court observed that the bankruptcy court assumed that the debtor owned some of these items and that they were not valueless. Attempting to bring herself within the reach of these cases, the Debtor states that "heating and lighting equipment and machinery ... [could include] lamps, portable heaters, humidifiers or dehumidifiers [which] could ... fall within the meaning of appliances and, in the case of certain lighting equipment not permanently affixed to the property, furniture." Brief in Support of Debtor's Motion to Value the Interest of S & S Family Partnership in 2423 S. Hicks Street pursuant to 11 U.S.C. § 506(a) at 12–13. The Debtor's argument only begs the question of

whether any of these items exist. The reference to the items is stated in the abstract as if the Debtor is discussing goods that are hypothetical. Indeed, the Debtor does not make a claim to owning a portable heater, humidifier, dehumidifier or a qualifying lighting fixture. The Debtor has not offered proof of ownership of a single item of plumbing, heating or lighting equipment or machinery that could ostensibly be classified as personal property. But even if the Debtor testified to ownership of the above items, I would not be able to find that they fit within the description of plumbing, heating and lighting equipment or machinery affixed to the property. *Portable* heaters are not affixed to property, and it is a stretch to classify humidifiers and dehumidifiers as plumbing or heating equipment. Thus, unlike the *Wilson* trial court, I am unable to conclude that there is any item of property that fits within the mortgage description.

annexation; in this class fall such chattels as boilers and machinery affixed for the use of an owner or tenant but readily removable.

*Clayton v. Lienhard,* 312 Pa. 433, 436–37, 167 A. 321, 322 (1933).

As stated above, the 1988 Mortgage grants a security interest in "plumbing, heating and lighting equipment or machinery, now or hereafter installed upon the above described premises, notwithstanding any of such are capable of severance without harm to the real estate." Since the mortgage covers these items (1) only to the extent they are installed on the premises and (2) notwithstanding their being capable of severance without harm to the real estate, their character as realty or personalty is not clear. Depending on how particular items are installed in the house, plumbing, heating and lighting equipment could fall into either the second or third categories. Items which cannot be removed without damage will fall into the second category, *i.e.,* realty, while things that can be removed will fall into the third. Items in the latter category may or may not be fixtures depending on the intent of the parties as discerned by all of the circumstances. *Lehmann v. Keller,* 454 Pa.Super. 42, 50, 684 A.2d 618, 621–22 (1996); *In re Sheetz,* 657 A.2d 1011, 1013 (Pa.Commw.Ct.1995), *appeal denied,* 542 Pa. 653, 666 A.2d 1060 (1995). Parties are capable of agreeing on whether an item in the third category should be treated as a fixture or personalty, *Brandt v. Koppelman,* 169 Pa.Super. 236, 240, 82 A.2d 666, 667 (1951); 16 P.L.E. Fixtures § 5, but in the present case there is no evidence of any such agreement. The 1988 Mortgage may then reach items under the third category that are classifiable as personal property, but the analysis required to make that determination is fact specific, necessitating an evaluation of individual pieces of property. *See Lehmann, supra,* 454 Pa.Super. at 50, 684 A.2d at 621–22 (1996); *Sheetz, supra,* 657 A.2d at 1013. Since the Debtor provided no evidence about these items, this evaluation cannot be performed. Accordingly, I am unable to find that there is any personal property collateral under the 1988 Mortgage.

■ *1991 Mortgage.* The Debtor also relies on the 1991 Mortgage which required the Debtor to make monthly payments in an amount equal to one-twelfth of the annual amount of her real estate taxes and property insurance. Those payments were to be held by the mortgagee in a fund (the "Fund") and applied to the payment of taxes and insurance when due. The Fund was pledged as additional security for the sums secured by the Mortgage. Like the failure of proof with respect to the other claimed personal property collateral, the Debtor has failed to meet the burden of coming forward with evidence of an existing escrow account containing funds to which a security interest could attach. Indeed, the facts that are in evidence suggest the opposite to be true. The Debtor's admission to a tax delinquency on the Property of over $15,000 and substantial arrearage in the payment of monthly mortgage installments calls into question whether an escrow account ever existed, much less whether it had a positive balance.

Moreover, several courts have held as a matter of law that escrow accounts should not be considered items of independent value beyond the real estate to which they relate. *Rodriguez, supra,* 218 B.R. at 775–77; *In re Rosen, supra,* 208 B.R. at 353; *In re Halperin,* 170 B.R. 500, 502 (Bankr. D.Conn.1994). *Contra Lewandowski v. U.S. Department of Housing and Urban Development (In re Lewandowski),* 219 B.R. 99, 102 (Bankr.W.D.Pa.1998); *Dent v. Associates Equity Services Co. (In re Dent),* 130 B.R. 623, 629 (Bankr.S.D.Ga. 1991). Escrow accounts function to preserve the value of real estate collateral by supplying money to pay property taxes that may otherwise become a first lien on the property if not paid and to protect real estate against devaluation in the event of

casualty. The court in *Rosen*, 208 B.R. at 353, summed up this position as follows

> Unlike language where the security interest is taken in appliances, equipment or machinery, the "additional security" created by the Funds [escrow account] did not have an independent existence and served only to protect Nationsbanc's interest in the Residence Property. The tax contributions protected Nationsbanc from the imposition of a statutory tax lien on the Residence Property while the hazard insurance contributions ensured the Residence Property would be protected in the event of destruction. The Escrow Account was taken not as additional collateral of the Debtor to secure the Mortgage, but was created pursuant to the Mortgage to protect the Residence Property.
>
> ... Nationsbanc did not receive any additional benefit from the Funds, other than assurance that the Residence Property would be protected.

*Rosen*, 208 B.R. at 353.

I am guided by this reasoning in the present case and conclude that the escrow account in the 1991 Mortgage was not created to provide and in fact did not provide S & S with additional security for its mortgage. The sole function of the escrow was to protect the value of the collateral already in place.

Debtor's citation to *Hammond* as authority for the contrary proposition (*i.e.*, "This is precisely what the Third Circuit had in mind when it referred to security interests in 'Escrow Accounts' as additional security.") is unpersuasive. Since *Hammond* did not involve an escrow account, I cannot know what the Circuit Court had in mind when it made that comment, particularly as I can conceive of escrow accounts that may serve as additional security.

Finally, the Debtor looks to the appurtenance clause in the 1991 Mortgage as another source of security interests in personal property. This clause defines the mortgage as including, in addition to the land, all "improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument." Mortgage dated June 25, 1991, appended to Exhibit D–14. The Debtor does not focus on which of the items creates a security interest in personalty, but as far as I can tell none of them do.

Pennsylvania statutory law defines the rights and interests in property transferred by a deed purporting to convey a fee simple interest in real estate:

> All deeds or instruments in writing for conveying or releasing land hereafter executed, granting or conveying lands, unless an exception or reservation be made therein, shall be construed to include all the estate, right, title, interest, property, claim, and demand whatsoever, of the grantor or grantors, in law, equity, or otherwise howsoever, of, in, and to the same, and every part thereof, together with all and singular the improvements, ways, waters, watercourses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof.

21 P.S. § 3. The statute establishes that real estate includes the rents, issues and profits arising from improvements, ways, waters, watercourses, rights, liberties, privileges, hereditaments and appurtenances associated with the land. Accordingly, it is not surprising that courts have uniformly rejected the contention that language in a mortgage granting a security interest in such items as rents, royalties, water rights, water stock, issues and profits create a security interest in personal property, generally considering these items to be a component of a fee simple interest in real estate. *Citicorp Mortgage, Inc. v. Kane (In re Hirsch)*, 166 B.R. 248,

249–54 (E.D.Pa.1994) (rights, rents, royalties, water rights and stock); *Hackling v. Midfirst Bank (In re Hackling)*, 231 B.R. 590, 591 (Bankr.E.D.Pa.1999) (rents); *In re Anderson*, 209 B.R. 639, 641–42 (Bankr. M.D.Pa.1997) (rents); *Rosen*, 208 B.R. at 349–50 (rents and profits); *Mellon Bank, N.A. v. Crystian (In re Crystian)*, 197 B.R. 803, 804–05 (W.D.Pa.1996) (rights, rents, royalties, mineral, oil and gas rights and profits, water rights and stock); *Wilkinson v. Fleet Mortgage Corporation (In re Wilkinson)*, 189 B.R. at 327, 329–30 (Bankr.E.D.1995) (rents, issues and profits); *see also Marine National Bank v. Northwest Pennsylvania Bank & Trust Co.*, 308 Pa.Super. 154, 159, 454 A.2d 67, 70 (1982) (right to unaccrued rents is interest in real property). Likewise the enumeration of items classifiable as fixtures will also not bring a mortgage out from protection of the anti-modification clause because fixtures are a component of real property. *Rodriguez, supra*, 218 B.R. at 776; *Smith v. Weaver*, 445 Pa.Super. 461, 467, 665 A.2d 1215, 1218 (1995) (*citing* Black's Law Dictionary 574 (5th Ed.1979)) ("A fixture is an article in the nature of personal property which has been so annexed to the realty that it is regarded as part and parcel of the land."). The reference in the statute to improvements includes not only buildings, but all of the things attached to a building that become fixtures. *First National Bank v. Reichneder*, 371 Pa. 463, 469, 91 A.2d 277, 280 (1952); *see also Rodriguez, supra*, 218 B.R. at 777. Pennsylvania law expressly holds that mineral, oil and gas rights are interests in real property, *Sedat, Inc. v. Commonwealth of Pennsylvania, Department of Environmental Resources*, 165 Pa.Comwlth. 431, 439, 645 A.2d 407, 411 (1994); *Duquesne Natural Gas Co.*, 203 Pa.Super. 102, 105, 198 A.2d 608, 610 (1964), and it is fairly obvious that easements and appurtenances are also interests in real estate, *see Brady v. Yodanza*, 493 Pa. 186, 190–93, 425 A.2d 726, 728–29 (1981) (discussing easements); *Schwoyer v. Smith*, 388 Pa. 637, 641–43, 131 A.2d 385, 388 (1957) (same); *Commonwealth of Pennsylvania v. Haveg Industries, Inc.*, 411 Pa. 515, 519–20, 192 A.2d 376, 378 (1963) (discussing appurtenances).

The Debtor contends that the construction to be given the mortgage is directly governed by the various Third Circuit cases addressing the scope of the anti-modification clause, *Johns*, 37 F.3d at 1021; *Hammond*, 27 F.3d at 52; *Sapos*, 967 F.2d at 918; and *Wilson*, 895 F.2d at 128–29. Yet each of these cases is distinguishable. The mortgages at issue in these cases covered some combination of furniture and/or appliances in addition to other things such as rents, profits or fixtures, *see* pages 205–206 *infra*, and there is no case in which the Court determined the status of an escrow account. I agree that appliances and furniture which are inevitably found in residences are personal property which most likely will allow strip down of mortgages containing this additional collateral. However, S & S's mortgages contain no such property. As stated above, I am unable to make a similar inference with respect to the plumbing, heating and lighting equipment in the 1988 Mortgage.[14]

14. The 1988 Mortgage covers plumbing, heating and lighting equipment or machinery that is installed upon the premises. The single requirement of installation removes just about all furniture and small appliances from coverage because these are items that do not require installation. The additional requirement that the items relate to plumbing, heating and lighting is a reference to pipes, sinks, toilets, radiators, furnaces, faucets, overhead light fixtures, etc., but none of these are commonly regarded as furniture or appliances. To the contrary, these are things that customarily remain in a residence as it changes hands between various occupants and owners. Of all these items, overhead lighting is the one item an occupant may possibly view as personalty to be installed in successive residences, and even then this expectation is limited to a select set of decorative fixtures. (There is, of course, no indication that the Debtor owns any lighting of this nature.) In sum, without the express inclusion of furniture and/or appliances in the 1988 mortgage, the appurtenance clause therein is fundamen-

I therefore conclude that there is no additional personal property collateral secured by either the 1988 or 1991 Mortgages and as a result hold that both mortgages are protected against modification under § 1322(b)(2).

### B.

I turn next to Debtor's alternative argument that there is no value as to which S & S's claim can attach, rendering its claim unsecured and unprotected by § 1322(b)(2). As an initial matter, Debtor and S & S dispute the extent of Debtor's interest in the Property for this purpose. Their disagreement flows, *inter alia*, from the fact that due to Debtor's post-petition divorce, she now holds the Property as a joint tenant whereas on the petition date, her interest was as a tenant in the entirety. Presumably the parties recognize the different consequences which result where property is held as entireties and in common as reflected in a line of cases decided by this Court. *Compare In re Jablonski*, 70 B.R. 381 (Bankr.E.D.Pa.1987), *aff'd* 88 B.R. 652 (E.D.Pa.1988) and *In re Panas*, 68 B.R. 421 (Bankr.E.D.Pa.1986) (where property held as tenants by entireties, the entire value would be included for measuring the estate's interest where only one marital partner is debtor) *with Crompton v. Boulevard Mortgage Co. (In re Crompton)*, 68 B.R. 831 (Bankr.E.D.Pa.1987) and *Whitener v. Graham (In re Whitener)*, 63 B.R. 701 (Bankr.E.D.Pa.1986) (where property held as tenants in common, only one half value of the property included).[15] The Debtor presents several cases which fix valuation at confirmation in support of the temporal position she advances. I find these cases inapposite as they deal with the valuation of an interest and not the identity of it. S & S offers no assistance with this question either. Fortunately, the outcome in this case is not determined by

the answer to this question. I therefore accept, without deciding the merit of Debtor's legal position, that only half the value of the Property is the beginning point of determining S & S's secured claim. I also accept for purposes of deciding the Motion, without making any determination on value, that the value of the Property is $35,000. Calculated in that manner, subtracting the purported prior lien value of $19,303.93 from $17,500 yields zero value to cover the S & S mortgages. According to Debtor then, S & S has no secured claim under § 506 and the anti-modification clause of § 1322(b)(2) does not protect it.

The facts of this case illustrate why the legal position advanced by the Debtor and embraced by a majority of courts to consider the issue is flawed. As noted above, my review of the evidence suggests that there may have only been $17,281.77 of prior liens. On this analysis, S & S is an undersecured creditor entitled to the protection of § 1322(b)(2) as held by the Supreme Court in *Nobelman*. However, even accepting the existence of the liens claimed by Debtor, a $2,000 swing in the value of the Property would drive a different result than the one advocated by the Debtor. The parties' appraisers, both experienced and competent, were $15,000 apart. Can I say that there is not an additional $2,000 in value above the Debtor's appraisal? There is no principled way to make a decision based on valuation vagaries such as these. It is perhaps for that reason that the Court in *Nobelman* held that a § 506(a) "determination does not necessarily mean that the "rights" the bank enjoys as a mortgagee, which are protected by § 1322(b)(2), are limited by the valuation of its secured claim." 508 U.S. at 329, 113 S.Ct. 2106.

tally different from the clauses at issue in any of the Third Circuit cases.

**15.** The basis for the distinction is that the mortgagee is not precluded from seeking to partition the property and foreclose on the

non-debtor's interest. This option is not available with respect to entireties property which may not be severed so long as the parties are married.

*Nobelman* involved a residence valued at $23,500 and a mortgage claim for $71,335. The debtors proposed to bifurcate the mortgagee's claim under § 506(a) into a secured claim of $23,500 and an unsecured claim of $47,835. Under the terms of the debtors' proposed Chapter 13 plan, the mortgagee would receive payments pursuant to its mortgage contract up to the amount of its secured claim but would receive nothing on its unsecured claim.

The debtors argued that their treatment of the mortgagee's claim was permissible because the anti-modification clause in § 1322(b)(2) applies only the extent that a mortgagee holds a "secured claim" in a debtor's residence and that the court must first look to § 506(a) to determine the value of the mortgagee's "secured claim." They contended that since under § 506(a), the mortgagee was the holder of a "secured claim" only in the amount of $23,500 and their Chapter 13 plan proposed to make payments pursuant to the terms of the mortgage contract up to that amount, they had not altered the mortgagee's rights as a holder of that claim. As for the mortgagee's unsecured claim, they argued that § 1322(b)(2) allowed unconditional modification of it. The Supreme Court disagreed with this interpretation of § 1322(b)(2).

The Supreme Court reasoned that the debtors' interpretation of § 1322(b)(2) failed to adequately account for the provision's focus on "rights." Expounding on this point, the Supreme Court stated:

> [Section 1322(b)(2)] does not state that a plan may not modify "a claim secured only by" a home mortgage. Rather, it focuses on the modification of the "rights of holders" of such claims. By virtue of its mortgage contract with [the debtors], the [mortgagee] is indisputably the holder of a claim secured by a lien on [the debtors'] home.

*Id.* at 328, 113 S.Ct. 2106. Noting that the term "right" is not defined in the Code and, therefore, that the mortgagee's rights were defined by state law, the Su-

preme Court instructed that the mortgagee's rights were reflected in the mortgage instrument. *Id.* at 329, 113 S.Ct. 2106. According to the Supreme Court, the mortgagee's rights included "the right to repayment of the principal over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against [the debtors'] residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." *Id.*

The Supreme Court also rejected the debtors' contention that the "rule of the last antecedent" should apply in interpreting the anti-modification clause in § 1322(b)(2). Summarizing this argument, the Supreme Court stated:

> According to this argument, the operative clause "other than a claim secured only by a security interest in … the debtor's principal residence" must be read to refer to and modify its immediate antecedent, "secured claims." Thus, § 1322(b)(2)'s protection would then apply only to that subset of allowed "secured claims," determined by application of § 506(a), that are secured by a lien on the debtor's home—including, with respect to the mortgage involved here, the bank's secured claim for $23,500.

508 U.S. at 330, 113 S.Ct. 2106. The Supreme Court concluded that, although § 1322(b)(2) could be read in the manner suggested by debtors, such a reading was not compelled nor reasonable since, as a practical matter, it was impossible to modify the unsecured component of the mortgagee's claim without modifying the secured component of the claim. *Id.* at 330–31, 113 S.Ct. 2106. Focusing on the fact that Congress chose to utilize the phrase "claim secured…by" in § 1322(b)(2)'s exception rather than repeating the term of art "secured claim," and noting that the word "claim" is broadly defined under the Code to encompass any "right to payment, whether …. secure[d] or unsecured," the

Supreme Court reasoned that it is plausible and more reasonable to read the phrase "a claim secured only by a [homestead lien]" as referring to the lienholder's entire claim, including both the secured and the unsecured components of the claim. *Id.* at 331, 113 S.Ct. 2106. This interpretation, the Supreme Court noted was, was supported by the language of § 506(a) which "itself uses the phrase "claim....secured by a lien" to encompass both portions of an undersecured claim." *Id.*

Courts adopting the view (the "minority view") that the rights of mortgages with wholly unsecured claims cannot be modified focus upon the aforementioned portions of the Supreme Court's decision. *See e.g., In re Perkins,* 237 B.R. 658 (Bankr. S.D.Ohio 1999); *Tanner v. Firstplus Financial Inc. (In re Tanner),* 223 B.R. 379 (Bankr.M.D.Fla.1998); *In re Jones, supra,* 201 B.R. at 373–74; *In re Neverla, supra.* However, there is additional language in the Supreme Court's discussion in *Nobelman* which lends support to the view (the "majority view") that the anti-modification clause in § 1322(b)(2) does not protect homestead mortgagees with wholly unsecured claims. This language consists of favorable comments regarding the debtors' use of § 506(a) to value the mortgagee's claim. These comments, which follow on the heels of the Supreme Court's discussion regarding § 1322(b)(2)'s focus on "rights," are quoted below:

> By virtue of its mortgage contract with [the debtors], the [mortgagee] is indisputably the holder of a claim secured by a lien on [debtors'] home. [Debtors] were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the [mortgagee's] secured claim. It was permissible for [debtors] to seek a valuation in proposing their Chapter 13 plan, since § 506(a) states that "[s]uch value shall be determined ... in conjunction with any hearing ... on a plan affecting such creditor's interest." But even if we accept [debtors'] valuation, the bank is still the

> "holder" of a "secured claim," because [debtors'] home retains $23,500 of value as collateral.

508 U.S. at 328–29, 113 S.Ct. 2106. Courts espousing the majority viewpoint rely primarily on these comments to support their interpretation of the statute. *SeeLam v. Investors Thrift (In re Lam), supra,* 211 B.R. at 40; *Johnson v. Asset Management Group, LLC,* 226 B.R. 364 (D.Md.1998); *Associates Financial Services Corporation v. Purdue (In re Purdue),* 187 B.R. 188, 189–190 (S.D.Ohio 1995); *In re Cervelli,* 213 B.R. 900, 904–910 (Bankr.D.N.J.1997); *In re Sette,* 164 B.R. 453, 455 (Bankr.E.D.N.Y.1994); *In re Plouffe,* 157 B.R. 198, 199–200 (Bankr. D.Conn.1993). They reason that unless a mortgagee must be at least partially secured under § 506(a) in order for the anti-modification clause to be applicable, the Supreme Court's references to § 506(a) in *Nobelman* would be rendered meaningless. *See Lam, supra,* 211 B.R. at 41; *In re Williams,* 161 B.R. 27, 29–30 (Bankr. E.D.Ky.1993). *See also Johnson v. Asset Management Group, LLC, supra,* at 367–68 (reasoning that Supreme Court's references to § 506(a) refute the analysis of courts that find valuation to be irrelevant in determining whether anti-modification clause applies).

Courts adopting the minority position contend that the majority places too much emphasis on the Supreme Court's references to § 506(a) and fail to view these references in the context of the rest of the Supreme Court's decision. *See In re Jones, supra,* 201 B.R. at 373; *In re Neverla, supra,* 194 B.R. at 550–51. The minority asserts that given the Supreme Court's emphasis in *Nobelman* on the mortgagee's "rights," it is the "existence of a mortgage lien that is crucial in the application of § 1322(b)(2), not the value of the residence subject to the lien." *Tanner, supra,* 223 B.R. at 382. *See also In re Neverla, supra,* 194 B.R. at 551 ("The *Nobelman* decision correctly pointed out that the focus of Section 1322(b)(2) is on the rights and status of a Homestead

Mortgage holder, not on the value of its collateral.").

The minority finds support for its position in the plain language of the anti-modification clause. Instead of stating "other than a secured claim. . . ." which would plainly limit the clause's application to secured claims, the anti-modification clause states "other than a claim secured only by . . ." According to the minority position, this choice of words indicates Congress' intention to except mortgagees' claims from modification, whether secured in accordance with a section 506 valuation or not, as long as the claimants hold mortgages on a debtor's primary residence. *Tanner, supra,* 223 B.R. at 382; *In re Bauler,* 215 B.R. 628, 632–33 (Bankr. D.N.M.1997); *Fraize v. Beneficial Mortgage Corporation (In re Fraize),* 208 B.R. 311, 313 (Bankr.D.N.H.1997); *accord In re Perry, supra,* 235 B.R. at 607 (by using phrase "security interest" in anti-modification clause instead of term of art "secured claim," Congress indicated that it "did not intend to predicate the protection of a creditor's rights upon the value of the underlying collateral.").

Further, the minority reasons that if § 506(a) were utilized to determine whether the holder of a mortgage claim is protected by § 1322(b)(2), too much emphasis

would be placed on the inexact science of valuation. *See American General Finance, Inc. v. Dickerson, supra,* 229 B.R. at 542–43; *In re Perry, supra,* 235 B.R. at 607–08; *Lewandowski v. U.S. Dept. of Housing and Urban Development (In re Lewandowski),* 219 B.R. 99, 104 (Bankr. W.D.Pa.1998); *Tanner, supra,* 223 B.R. at 383;[16] *In re Bauler, supra,* 215 B.R. at 633; *Fraize,* 208 B.R. at 313; *In re Neverla,* 194 B.R. at 551.[17] Providing an example to illustrate this point, one bankruptcy court stated:

> If one assumes the value of the debtor's primary residence to be $100,000 and if the first mortgage is equal to that value, then a second mortgage would hold a zero secured claim under section 506 and not be protected under section 1322(b)(2). However, should the first mortgage be $99,999, the second mortgagee would hold a $1 secured claim under section 506 and, pursuant to *Nobelman,* would be fully protected under section 1322(b)(2). This surely cannot be the result anticipated by Congress.

*Fraize, supra,* 208 B.R. at 313.[18]

■■■ I am persuaded by the minority position on this issue. I agree that in *Nobelman,* the Supreme Court's determination that the mortgagee's claim was protected from modification under

**16.** The *Tanner* court reasoned that if unsecured mortgagees are not protected under § 1322(b)(2), "cases may turn on an arbitrary or unscientific valuation and not the bargained for rights under the mortgage." 223 B.R. at 383.

**17.** Using the facts in *In re Hornes,* 160 B.R. 709 (Bankr.D.Conn.1993) (adopting the majority position), to provide an example of why valuation under § 506(a) should not be the determining factor as to whether § 1322(b)(2) protects a mortgagee, the bankruptcy court in *In re Neverla, supra,* stated:

> Interestingly, the avoided Homestead Mortgage holder in the *Hornes* case was wholly unsecured because the residence had a fair market value of $93,000, a first mortgage balance of $92,412.45, leaving equity of approximately $600.00; however, there was a $1,217.97 first priority lien apparently due to an unpaid Water Pollution Control Authority charge, presumably payable directly

by the debtor. If the debtor had paid all, or just 52% of that water charge, the subordinate Homestead Mortgage holder in *Hornes* would have been required to be paid in full under the *Nobelman* decision. *In re Neverla, supra,* 194 B.R. at 552 n. 9.

**18.** Commenting on this issue, the court in *American General Finance, Inc. v. Dickerson, supra,* stated:

> Under the majority view, if the remaining value of the subject property (after accounting for the senior lienholder's claim) is merely one cent more than the amount of the junior mortgage, then the junior creditor would be deemed secured and thus protected under § 1322(b)(2), while those junior mortgagees who lack that penny of equity would have their claims stripped. This would place too much emphasis on the valuation process, which is inexact and is subject to fluctuations in the market. Such a result is contrary to *No-*

§ 1322(b)(2) was based on the fact the mortgagee possessed a security interest in the debtors' residence and not on the fact that it had a partially secured claim. While, admittedly, the Supreme Court referred to § 506(a) in a manner that could be interpreted as supporting the utilization of that provision to determine whether a mortgagee's rights are protected under § 1322(b)(2), that view seems inconsistent with the rest of the Supreme Court's decision focusing on the rights of mortgagees. By interpreting § 1322(b)(2) based on the Supreme Court's isolated references to § 506(a) (all of which appear in one paragraph) when the rest of the *Nobelman* decision suggests a different construct of the provision, I think the majority errs.

Moreover, I agree with the courts adopting the minority position that the determination of whether a mortgagee's rights will be protected under § 1322(b)(2) should not rise and fall on valuation.[19] As other courts have recognized, valuation is not an exact science. It is not infrequent that a court may be called upon, as I am in the instant case, to determine the value of a debtor's residence based upon two competent appraisals more than $10,000 apart. While there may be discernible reasons to . increase or lower the value reached by the

appraisers, a court may be put in the situation after it has exhausted that approach of reaching a compromise value somewhere between the two suggested by the experts. *See* Harry J. Haynsworth IV, *Valuation of Business Interests,* 33 Mercer L.Rev. 457, 486–87 (1982) (*quoted in* Walter W. Miller, Jr., Bankruptcy's New Value Exception: No Longer a Necessity, 77 Boston Univ. L.Rev. 975, 1024 n. 158 (1997)) ("Valuation cases usually end up as battles between expert witnesses, each of whom will give more or less weight to each factor . . . [T]he court will . . . decide on a value which represents a compromise between the range of values found by each side's experts."). Under such circumstances, there is nothing sacred about the value assigned by the court. In the absence of some concrete indication from Congress, I cannot conclude that it intended the determination of whether a homestead mortgagee is protected under § 1322(b)(2) to depend upon a valuation decision. Nowhere else in the Code does the treatment of a creditor hinge so precariously on the existence of one dollar of value.[20]

Accordingly, I hold that even if the secured component of S & S's claim is valued at zero, it is still entitled to the protection

---

belman, because there, the Supreme Court did not require any level of equity for § 1322(b)(2) protection. 229 B.R. at 542–43.

**19.** The Honorable Keith M. Lundin in his treatise on Chapter 13 bankruptcy law convincingly reasons:

Linking the antimodification clause protection in § 1322(b)(2) to the existence of any allowable secured claim means that a mortgage holder with one dollar of collateral value is protected from modification to the extent of its entire claim, while a mortgage holder pennies "under water" forfeits the protection from modification with respect to its entire mortgage. This ascribes to Congress the odd intent to extend the antimodification protection in § 1322(b)(2) to residential mortgage holders with any toehold on the debtor's property and to refuse that same protection where collateral values have shifted a peppercorn below the creditor's position. The lien rights of either creditor under state law—rights of much

concern to Justice Thomas in *Nobelman*— are typically the same whether the mortgage holder is a dollar above or a dollar below the allowed secured claim threshold. This reading of *Nobelman* puts an undeserved premium on valuation of residential real property—it assumes a degree of accuracy in the valuation process that is without foundation in reality.

Keith M. Lundin, Chapter 13 Bankruptcy, Second Edition § 4.46, at 220 (1996 Supp.).

**20.** Not surprisingly, the majority courts take a contrary view. The bankruptcy court in *In re Hornes,* 160 B.R. at 716–17, addressed this point, stating:

The code frequently protects, modifies, or abrogates important rights based on property valuations, and those valuations are often the key contested issue in reorganization cases. If a plan proposes to distribute $1 less than the allowed amount of a secured claim, determined after a ¶ 506(a) valuation hearing, the plan will fail and the

of the anti-modification clause which prohibits modification of the rights of holders of a claim secured only be a security interest in the debtor's principal residence. While this conclusion is not free of some doubt, I conclude that application of anti-modification to all residential mortgages, without regard to valuation, is most consistent with the Bankruptcy Code as interpreted by the Supreme Court's ruling in *Nobelman.*

## CONCLUSION

Finding no basis to limit the availability of § 1322(b)(2) protection for the S & S, Debtor may not bifurcate S & S's secured claim. Accordingly, it is not necessary for the Court to issue a determination under § 506(a) of S & S's interest in the Property. An Order consistent with the foregoing Memorandum Opinion shall issue.

debtor will lose the protection of the automatic stay. *See* ¶¶ 1129(b)(2)(A); 1325(a)(5)(B). Whether and to what extent any creditor receives interest on its claim *717 under ¶ 506(b), and whether the debtor may use its cash collateral without its consent, depend on the value of the creditor's collateral. *See* ¶ 363(c), (e). Claims secured by any property in chapter 11 cases, and by any property other than the debtor's principal residence in chapter 13 cases, have always been subject to modification, and apparently remain so after *Nobelman.* (citations omitted).

Notably none of these examples reflect the all or nothing consequences of the majority rule. They merely demonstrate that the treatment of a claim may be driven by value, a proposition that pervades the Code, but do not evidence the total loss of a secured claim because of a $1 valuation deviation. For example, the debtor can save its plan be adding $1 to the plan treatment or adequate protection payment to maintain the stay.