### In re: Karen Grace ABRUZZO, aka Karen Grace Francks, Debtor.

### No. 99–14011DWS.

United States Bankruptcy Court, E.D. Pennsylvania.

May 25, 2000.

engaged in the unauthorized practice of law.

Irwin Trauss, Esquire, Philadelphia Legal Assistance, Philadelphia, Counsel for Debtor/Defendant.

Michael A. Cataldo, Esquire, Cibik & Cataldo, Philadelphia, Counsel for S & S Family Partnership.

Edward Sparkman, Esquire, Philadelphia, Chapter 13 Trustee.

Dave P. Adams, Esquire, Philadelphia, United States Trustee.

## *OPINION*

DIANE WEISS SIGMUND,
Bankruptcy Judge.

On November 11, 1999 I entered an Order with an accompanying Memorandum Opinion ("Abruzzo I") in connection with Debtor's motion (the "Motion") under 11 U.S.C. § 506(a) and Bankruptcy Rule

3012 to value the interest of her mortgagee S & S Family Partnership ("S & S") in the estate's interest in certain real property (the "Property"), a row home located at 2423 South Hicks Street, Philadelphia, Pennsylvania in which Debtor resides. Because I found that the S & S's mortgages could not be modified under § 1322(b)(2) in her Chapter 13 case, I concluded that no valuation was required.[1] *In re Abruzzo*, 245 B.R. 201 (Bankr.E.D.Pa. 1999). On November 19, 1999, Debtor appealed my decision.[2] On December 21, 1999, the Debtor converted her case from one under Chapter 13 to one under Chapter 7.[3] Because of the conversion, the anti-modification clause of § 1322 was no longer applicable. *In re Abruzzo*, 2000 WL 420635, at *2 (E.D.Pa. April 10, 2000). However, Debtor asked that my decision not to value the secured claim be reversed, and the matter be remanded to me to conduct the valuation pursuant to § 506(a) and Rule 3012. The District Court did so.[4]

■ While agreeing with the District Court that § 506(a) has applicability to a Chapter 7 case, its application follows its purpose in the case. As I was unaware of the purpose of the Rule 3012 motion in the converted Chapter 7 case and as this Court is foreclosed from rendering advisory opinions, *In re Coffin v. Malvern Federal Savings Bank*, 90 F.3d 851, 853 (3d Cir.1996), I scheduled a hearing in which counsel to the parties were to appear and advise me of what was at issue in this Chapter 7 case. According to Debtor's counsel, the purpose for which a Rule 3012 motion is made is irrelevant. He believes that so long as § 506(a) is applicable to cases under Chapter 7, a Rule 3012 motion may be adjudicated by the Court. The problem with that view, in addition to the prohibition on courts rendering advisory opinions, is that the statute expressly provides otherwise.

> Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of the such property, and in conjunction with any hearing on such disposition or use

1. The point of the valuation was to bifurcate S & S's claim into secured and unsecured components pursuant to § 506(a) with a view towards avoiding the lien on the claim to the extent it exceeds the value of the collateral. The valuation motion did not ask for the modification which was the subject of a separate adversary proceeding but was preliminary thereto. In its response to the Motion, S & S pled the inapplicability of anti-modification where its mortgages were secured by only residential real estate. Debtor asserted the contrary and further contended that since the mortgages were completely unsecured, the anti-modification clause would not apply. Reviewing both these legal positions, I held that the anti-modification clause did apply, obviating the purpose of the valuation. Since *Abruzzo I*, the Third Circuit Court of Appeals has decided *In re McDonald*, 205 F.3d 606 (3d Cir.2000), in which it held that a secured creditor whose claim is totally unsecured is not protected by the anti-modification clause of § 1322(b)(2).

2. I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi*, 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino*, 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.*, 61 F.3d 197 (3d Cir.1995).

The Debtor contemporaneously sought reconsideration of the Order, which was denied by order dated December 7, 1999. Accordingly, the appeal was not transmitted to the district court until December 17, 1999. At that time there was a motion to dismiss filed by the Chapter 13 trustee pending.

3. On May 4, 2000, an Order was entered approving the Chapter 7 trustee's report of no assets and discharging the Chapter 7 trustee. The Debtor received her bankruptcy discharge on May 4, 2000. The Chapter 7 case has been fully administered, and but for this remand, is ready to be closed.

4. As the District Court concluded that § 506(a) was applicable to cases arising under all chapters of the Code, it vacated my order and remanded with instructions to perform the valuation and division of S & S's claim as requested by Debtor. It made clear that in so doing, it was not addressing the applicability of § 506(d) which it left to further proceedings in this Court.

or on a plan affecting the creditor's interest.

11 U.S.C. § 506(a).[5] This second sentence of § 506(a) controls my decision. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 961, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). As aptly summarized by a noted bankruptcy treatise:

> [T]o understand the specific rules underlying application of section 506(a), it is important to identify and distinguish the specific contexts in which these rules are to be applied. It is critical to reiterate that section 506(a) has no independent significance. On the contrary, the significance of section 506(a) lies in its role in setting the stage for the application of a number of other sections of the Code.

L. King, 4 Collier on Bankruptcy ¶ 506.03[4], at 506–27 (15th ed. rev.1999). Assets may be valued in accordance with § 506(a) at different times depending on the particular context in which the valuation is to take place. *Id.* ¶ 506.03[10]. For example, valuation for the purpose of lien avoidance under § 522(f) is determined at the time the petition is filed. *In re Windfelder*, 82 B.R. 367, 371 (Bankr.E.D.Pa. 1988). Valuation for the purpose of Chapter 13 cram down is determined by some courts as of the date of the petition but by most others at a later time, *i.e.*, the date on which the valuation motion is initiated or heard or the date of plan confirmation. K. Lundin, 1 Chapter 13 Bankruptcy

§ 5.40, at 5–112–13 (1993)(citing cases). Valuation for the purpose of relief from stay under § 362(d)(2) or determining adequate protection under § 361 may be fixed at some 'intermediate time when the motion is filed. Moreover, if the property is being retained by the debtor a fair market value may be appropriate while if it is to be liquidated, a liquidation value may be compelled. These variables demonstrate the inability of a court to determine value without knowledge of the purpose for the request that it do so. Thus, I reject the notion that a Chapter 7 debtor has the right to obtain a determination of the valuation of security pursuant to Rule 3012 without regard to the purpose of such valuation. Indeed the language of Rule 3012 ("court *may* determine the value of a claim secured by a lien on property. . . .") makes clear that the valuation is within the discretion of the bankruptcy court.

■ In the instant case, the District Court has directed me to perform the valuation which was originally requested by the Debtor in her Chapter 13 case as a preliminary step to a cram down under § 1322(b)(2). A careful review of the Memorandum Opinion leads me to conclude that the basis for that direction was the District Court's conclusion that bifurcation may still have efficacy for the Debtor in this Chapter 7 case in the context of a future § 506(d) proceeding.[6] Since

---

**5.** The legislative history of § 506(a) expands on this concept:

> To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the debtor or creditor at the time of confirmation of the plan. S.Rep.No. 989, 95th Cong., 2d Sess. 68 (1977), U.S.Code Cong. & Admin. News 1978, 5787, 5854.

**6.** I draw this conclusion from the following footnote:

> We note only that our ruling here today calls for valuation and bifurcation under Bankruptcy Code § 506(a). We express no views as to whether Bankruptcy Code § 506(d) may be utilized in the instant case.

> This would appear to be an open question, because while the United States Supreme Court in *Nobelman* held that lien-stripping in a chapter 7 case is not permissible in the context of a partially unsecured claim, *McDonald* indicates that *Nobelman's* holding takes no position with regard to lien-stripping in a chapter 7 case with a wholly unsecured lien. *McDonald*, 205 F.3d at 614. We noted earlier in our Memorandum that the Bankruptcy Court does not appear to have answered the question of whether or not Appellee's claim is wholly unsecured. We shall not address it here, as it can be resolved by the Bankruptcy Court on remand.

2000 WL 420635, at *5 n. 4.

Debtor's counsel acknowledged that this was one possibility that he might pursue depending on the outcome of the valuation,[7] I will follow the District Court's direction with that purpose in mind. In so doing, I realize that a § 506(d) motion is not before me, and I do not address the question which the District Court believes to have been left open by *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), *i.e.*, whether "strip off" (as opposed to "strip down") of a secured claim is available in a Chapter 7 case.[8] Rather I merely respond to the District Court's direction that I conduct a valuation and bifurcation pursuant to § 506(a). Based on the record made on the hearing on the Motion and the findings contained in *Abruzzo I*, I find that the Property's value is $41,000, and that S & S has a secured claim of $3,218.23.[9]

## BACKGROUND

Many of the relevant facts were set forth in *Abruzzo I* from which I now quote:

> The Debtor filed a Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code on March 3, 1999. At the time, Debtor was married to Thomas Abruzzo ("Mr. Abruzzo"), but a divorce proceeding was pending and on April 28, 1999, their divorce was finalized. Divorce Decree, Exhibit D–4.
>
> The Debtor owns the Property with her former husband Mr. Abruzzo.[10] S &

**7.** He stated that in this case there were various purposes for which valuation was appropriate, a § 506(d) proceeding being one. He also stated that depending on the outcome, he might seek to reconvert the Chapter 7 case to Chapter 13. He also mentioned that a § 506(a) bifurcation was appropriate for relief from stay. I find neither of those alternative possibilities relevant here. While a debtor has an absolute right to convert a Chapter 7 case to one under Chapter 13, that right is not available if the case has been converted under § 1307 as here. Determining value for the purpose of a subsequent Chapter 13 case would not only be an advisory opinion but one I am incapable of rendering since the date of such valuation can not be now known. As for a determination of secured status in the context of a stay motion, I would point out that S & S already has received relief from the automatic stay and in any event, with the discharge of the debtor and the full administration of the estate, the stay is no longer applicable. 11 U.S.C. § 362(c).

**8.** "Stripping off" a lien occurs when the entire lien is avoided, whereas "stripping down" occurs when an unsecured lien is bifurcated and the unsecured component is avoided. *Yi v. Maryland (In re Yi)*, 219 B.R. 394, 397 n. 6 (E.D.Va.1998). *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), dealt with the "strip down" of an undersecured claim and left open the question of whether a secured claim could be modified under § 1332(b)(2) in a Chapter 13 case when the value of the property was less than the prior liens, *i.e.*, "stripped off." Until the recent opinion of the Third Circuit in *In re McDonald, supra*, holding that modification was permissible under the latter

scenario, bankruptcy judges in this Circuit (and elsewhere) were divided in their rulings. Like the ambiguity following *Nobelman*, there is a similar question as to whether the *Dewsnup* holding that in Chapter 7 a secured claim could not be reduced to the value of the collateral ("strip down") under § 506(d) is applicable where there is no value in the collateral to attach to the junior lien ("strip off"). *Compare Cunningham v. Homecomings Financial Network et al.*, 246 B.R. 241 (Bankr. D.Md.2000) (debtors cannot use lien avoidance provisions of statute to "strip off" junior deed of trust liens on property they sought to retain even though value of property was less than the senior secured debt) *with Farha v. First American Title Insurance (In re Farha)*, 246 B.R. 547 (Bankr.E.D.Mich.2000) (allegations that there was no equity in property to support mortgage lien were sufficient to state claim for "strip off" of junior mortgage.) and *Warthen v. Smith (In re Smith)*, 247 B.R. 191 (W.D.Va.2000) (Chapter 7 debtor can void non-consensual, wholly unsecured judgment liens on his real property; *Dewsnup* not applicable to non-consensual liens).

**9.** As the amount of S & S's total claim was not before Court, the Debtor having reserved the right to present her objections at a later date, I do not find the amount of the unsecured claim component. Moreover, as I find that S & S is an undersecured claimant, it appears that I will not have to reach the open § 506(d) issue on the facts of this case.

**10.** The Debtor testified that she and Thomas, who is presently incarcerated, have no agreement as to the equitable division of this marital asset in which she resides.

S holds two mortgages, dated November 17, 1988 (the "1988 Mortgage") and June 25, 1991 (the "1991 Mortgage"),[11] respectively which secure a filed claim in the amount of $63,019. Exhibit D–14. The Property is subject to a number of liens prior to the mortgages held by S & S. Exhibit D–8 evidences a proof of claim filed by First Union National Bank as Trustee for the Philadelphia Authority of Industrial Development ("PAID"). The claim identifies PAID as the holder by assignment of a secured claim in the amount of $12,049.97 on account of delinquent property taxes. Exhibit D–9 evidences a secured claim filed by the City of Philadelphia for additional delinquent property taxes in the amount of $3,431.03 and for a water and sewer bill of $954.64. Exhibit D–12 evidences a municipal claim filed by the City of Philadelphia as a lien to secure payment for a delinquent gas bill of $846.13.[12] These exhibits document the existence of municipal claims totaling $17,271.77 having lien priority superior to the mortgages held by S & S.

245 B.R. at 203.

Debtor contends that the value of the Property is $35,000. In support of that value, Debtor produced the expert opinion of Robert Ludwig, Senior Residential Appraiser dated May 25, 1999.[13] Exhibit D–1. Using a comparable sales approach, Ludwig identified three properties sold within the seven month period prior to his appraisal on May 25, 1999. He stated that proper appraisal methodology dictates using sales of six months or less, and he needed to slightly exceed that period to more properly reflect market condition. After making negative adjustments for their superior condition ($5,000), additional area ($1,500) and positive adjustments for the subject's partially finished basement ($1,000) and half bath ($1,000), the compar-

11. S & S acquired the mortgages by assignment from Carmen D'Amato and Nicholas D'Amato, the named mortgagees in both instruments. S & S did not present any evidence that explained the significance, if any, of holding two mortgages; rather it asserted its one claim as secured by both. The Debtor did not present any evidence that would require me to give separate consideration to each mortgage. As there are no intervening liens between the 1988 and 1991 mortgage, I will treat the mortgages, as did the parties, as one lien.

12. Debtor's evidence of prior liens equal to $19,303.07 purportedly does not include the amounts evidenced in Exhibit D–13, a gas bill showing a balance as of May 5, 1999 of $2,183.37, and Exhibit D–11, a printout purportedly from the Philadelphia Water Department showing an additional water and sewer debt in the amount of $2,021.30. However, Debtor's total of $19,303.07 *does* include the "unliened" Exhibit D–11 amounts which must be subtracted to properly state the liens superior to the S & S mortgages.

13. The bankruptcy proceedings were filed on March 29, 1999. The parties' valuations were based on appraisal reports prepared on May 25 (Debtor's appraisal) and June 15, 1999 (S & S's appraisal). The amount of the prior lien claims was derived from proofs of claim filed by the lienholders, Exhibits D–8 and D–9

which state the lien amount as of the date of filing, and a filed municipal claim, D–12, which states the claim amount and affixes a date stamp of April 1997. No proof of claim has been filed for this municipal claim for unpaid gas service although the City of Philadelphia has filed a proof of claim with respect to its municipal claim for real estate taxes and water/sewer. Exhibit D–9. Whether in filing its proof of claim, the City overlooked the additional gas claim or included it but labeled it incorrectly is not clear. (The amount of water/sewer is $944.64 as of the filing date.) It is also possible that the lien claim which is dated April 1997 was paid. In any event, as S & S has made no effort to verify whether this lien is still outstanding or is included in the City's filed claim, I have included the claim in the calculation of prior liens as argued by Debtor.

As stated above, the date of valuation is determined by the purpose of the valuation. In a Chapter 13 case, the valuation should be fairly proximate to the confirmation date of the debtor's plan. At the time this motion was filed, confirmation was scheduled within weeks. Thus, the dates of the appraisals were probative of the values I needed to reach. The question I must answer now is whether the appraisals still have vitality in the context of the present adjudication. I will address that issue below.

ative values were $32,500, $38,000 and $34,500 on sales that occurred in December 1998, November 1998 and January 1999. Exhibit D–1. Ludwig also noted the sale in May 1999 of 2427 Hicks Street, two doors away from the Property, at $18,000. He did not use this property in his appraisal because it was not available when he did his work. However, he does acknowledge that the property has only two bedrooms unlike the subject's three which would account for some of the differential.[14]

In Ludwig's view, the neighborhood is deteriorating as evidenced by an increase in boarded homes and foreclosure notices. Ludwig evaluated the condition of the Property, a 75 to 85 year old house, as "average," including a list of items of physical deterioration in his report which, in his opinion, would cost $7,000 to remedy. These problems were taken into account in his valuation.[15] Ludwig's view of the neighborhood was supported by the Debtor's testimony. She also testified to the condition of the Property producing numerous photographs of the interior and exterior. The photos illustrated water damage, incomplete siding, warped floors, and many needed repairs.

The Partnership's appraiser, Harvey Levin, MAI and SRA,[16] of Keystone Appraisal Company fixed a value of $50,000 on the Property also based on a comparable sales approach and an observation of the Property and neighborhood. His comparables were older than those of Ludwig, representing sales in November 1998, April 1998, April 1998 and March 1997. His view is that the fewer the adjustments required, the better the comparable. Therefore, time proximity yielded to the other features of the selected properties, geographic proximity and condition. His report, a Restricted Appraisal Report, expressly "presents limited discussions of the data, reasoning and analyses that were used in the appraisal process to develop the appraisers' opinion of value." Exhibit M–1. It is a ten page narrative, 4 pages of which consist of the standard appraisal assumptions, limitations and contingencies.[17] The data on the comparative sales

14. Ludwig obtained his information on this property from computer generated print outs generally available to appraisers from a service called Trend, Exhibit D–2, and the multiple listing service, Exhibit D–3. Upon examination of the Exhibit D–3 which contains additional information on the property, I note that not only is the house a two bedroom model but that it is referred to as a "handyman special, to be sold 'as is.'" This may explain the low sales price.

15. Because Ludwig characterizes the condition of the Property as "average," he makes no adjustment in relation to the other comparables in "average" condition. From this I conclude that while the Property is in need of repair and maintenance, the extent of the problem is no different than any other house of like age and use. On the contrary, he does make a $5,000 adjustment in comparison to the properties he deems in superior condition.

16. Levin spends little of his time currently doing residential appraisals, rather devoting himself principally to performing special purpose appraisals of industrial and contaminated properties. He describes residential appraising as the easiest of the appraisal skills which he long ago mastered and can employ at will. Ludwig, on the other hand, does this work on a daily basis. I found both experts to be qualified for the tasks they performed and find no reason to discount Levin's testimony for his lack of specialization nor Ludwig's for his relatively fewer credentials. They were both knowledgeable and thorough. Regrettably, their differing approaches made their conclusions difficult to reconcile.

17. Levin, a former member of the State Real Estate Commission, testified that his form of report was the appropriate vehicle to present valuation information in a litigation context. According to Levin, the form of report issued by Ludwig, designed for use in lending, is inappropriate for litigation. He was critical of the approach which makes subjective adjustments for each criteria, contending that the expertise of the appraiser is to interpret the market, making a lump sum adjustment to the comparables that are identified. Believing that the fewer the adjustments, the more reliable the valuation conclusion, he found Ludwig's use of comparables that required a $5,000 adjustment from a $40,000 sale price unreliable. I reach no conclusion on which appraisal form is appropriate for "litigation," but I do note that the form Ludwig employed

are set forth in a brief chart which specifies the property address, the sale date, the sale price and as to three properties, the numbers of bedrooms and baths and as to the fourth, the condition. The comparables were sold for $50,000, $48,000, $51,000 and $57,000. Given the ultimate value designated, Levin appears to have made little adjustment, finding these properties closely like the subject with one exception. The final property, located next door to the Property, was discounted $7,000 for its superior condition.[18] Unlike Ludwig and the Debtor, Levin believes the neighborhood is stable. He testified to this fact with conviction stating he was born in South Philadelphia and had appraised properties there for 35 years. Levin was also critical of Ludwig's choice of comparables noting that they were not as close to the subject as the ones he selected and that even for those streets, Ludwig appeared to pick and choose the sales at lower values. For example, he questioned why Ludwig used 2231 Chadwick which sold in December 1998 for $33,000 instead of 2212 Chadwick which sold in July 1998 at $50,000. Also why did he choose 2231 Opal which sold in December 1998 for $41,000 and ignored 2441 Opal which was under agreement of sale for $69,000? While Ludwig testified on rebuttal, he did not answer these questions.

## DISCUSSION

### A.

■ Before addressing the substance of the appraisal testimony, I need to address the question raised and not answered above. As of what date must the valuation

be done? For a number of reasons, I believe the appropriate date is the petition date, *i.e.,* March 29, 1999. This conclusion is supported by the case law. *See In re Mays,* 85 B.R. 955, 958 (Bankr.E.D.Pa. 1988), *aff'd,* 1988 WL 81716 (E.D.Pa. Aug.3, 1988) ("Since there is no plan in a Chapter 7 case, it is apparent that the evaluative moment in such case must be for all purposes the date of filing."). *See also Donahue v. Parker (In re Donahue ),* 110 B.R. 41, 44 (Bankr.D.Kan.1990) (citing cases). Any other date would be inconsistent with the reasoning of *Dewsnup.* Noting that a lien stays with the real property until foreclosure, the Court stated:

> Any increase over the judicially determined valuation *during bankruptcy* rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain.

502 U.S. at 417, 112 S.Ct. 773 (emphasis added). *See also Yi,* 219 B.R. at 396 n. 6 (*citing Dewsnup,* 502 U.S. at 417, 112 S.Ct. at 778.) ("The Supreme Court also noted that were petitioner's approach accepted, stripping down a lien would redound to the benefit of a debtor whose property increased in value *from the time of bankruptcy* until the time of foreclosure: If the value of the lien were limited to the judicially determined value of the property *at the time of filing a petition,* then any increase in value after that time would not provide additional security to creditors, even though the benefit of this increased

is commonly used in residential valuation hearings in this Court.

**18.** Levin knew nothing about this property and it appears that other than its close proximity, it has little in common with the subject. Exhibit D–6. Indeed Levin made a $7,000 adjustment due to its superior condition. I am puzzled why Levin included it given his view that the fewer the adjustments, the better the comparable. Moreover since it sold in March 1997, I agree with Debtor that it is an unreliable predictor of market value. Levin

was also cross examined about the $18,000 sale at 2427 Hicks, two doors away from the subject. He stated that there could be many reasons that a low price was secured, including the possibility of bad condition, atypical financing or the absence of an arms length transaction. (As noted above, part of the explanation may be the condition. *See* note 4 *supra.*). I find both these neighboring Hicks Street properties too different from the subject to be utilized as comparables.

value is essentially part of the original bargain struck by mortgagor and mortgagee.")[19] These decisions indicate that the operative date for a § 506(a) valuation to be performed for the purpose of § 506(d) lien avoidance is the inception of the bankruptcy case. Having concluded that the relevant valuation date is the petition date of March 29, 1999, I am able to utilize the evidence presented at the hearing which was gathered for appraisal reports prepared in May and June 1999 based on the best comparables each appraiser could identify at this time.[20]

### B.

There is a basic divergence in the approach taken by the two appraisers that cannot be easily reconciled. Ludwig, supported by the Debtor, testified that the neighborhood is deteriorating, and thus selected more recent but less proximate comparables. Levin, on the other hand, chose three comparables that are closer to the subject[21] but the sales are less recent. Both persuasively support their own methodological approach. Levin's comparables are not so old nor Ludwig's so distant to be questionable.[22]

Absent a tour of the neighborhood that would allow me to observe whether the difference in location of the comparables is more probative of value than the currency of the sales, I am left to some extent with the proverbial battle of the appraisers. Finding merit to both their positions, the only conclusion I can reach is to find some value in between. "While I recognize that the valuation of real property is not an exact science," *Windfelder,* 82 B.R. at 371, I am persuaded that Ludwig failed to adequately consider higher valued comparables on Chadwick and Opal Streets and in discounting the decline of the neighborhood, did not take into account that Hicks Street is a better location than Chadwick. On the other hand, it appears that Levin failed to take into consideration the number of foreclosures and boarded homes in the area, even if they were not, as he stated, in the immediate vicinity of the subject property. Moreover, to the extent that the area is deteriorating, the age of his comparables may diminish some of their utility. Based on all the evidence, I value the Property at $41,000.

This number is only the beginning point of my analysis since the statute directs both a determination of the estate's interest in the collateral and the creditor's interest in that interest. The nature of the

19. Most Chapter 7 cases are no-asset cases with a brief life span so that the timing of the valuation is not dispositive. However, where, as here, the case was converted from Chapter 13 to Chapter 7, the petition date was over one year ago. 11 U.S.C. § 348(a) (conversion of a case does not (with the exception of provisions not applicable here) effect a change in the date of the filing of the petition). Assuming *Dewsnup* is not applicable where there is no value for the secured claims, a Chapter 7 debtor could fail to pay creditors with prior liens over the pendency of the case and when there is no remaining equity for the junior creditor, file a § 506(a) motion. The deterioration in the creditor's position over the course of the bankruptcy would result in a windfall to the debtor who would then move to avoid the lien under § 506(d) which could not have been avoided at the inception of the case under *Dewsnup.*

20. At the recent hearing to consider the parties' views of this Court's duty under the District Court opinion, neither counsel questioned the sufficiency of the evidence, presumably satisfied that the record made at the earlier hearing is dispositive for the purposes of the remanded motion.

21. Levin's comparables were closer to the subject (1–3 blocks versus 4–9 blocks, a block being ⅒ mile) and described as being in St. Monica's "parish," a geographic designation used to describe a neighborhood served by a specific church. Levin also testified that Ludwig's use of two properties on Chadwick Street undercut the authority of his appraisal, contending that such block was inferior to Hicks Street.

22. I would agree that the March 1997 sale is too old to be useful. However, I found no satisfactory explanation as to why the $50,000 Chadwick sale in July 1998 was totally ignored in favor of one for $33,000 five months later. Nothing in the record supported that great a decline in value over this short period.

estate's interest must be examined. In this case, the Debtor's interest at the commencement of the case was as a tenant by the entirety. That interest changed to a joint tenancy when the Debtor was divorced on April 29, 1999. In either case the estate's interest is something less than a full ownership interest in the Property. The creditor's interest in that interest takes into account prior liens, in this case requiring a deduction of $17,281.77.

Keeping in mind that it is only the Debtor's interest in the Property that is being valued, the Debtor argues that value of her interest in the Property is one half the total value *i.e.*, $20,500, since her interest at the time of the hearing was as a joint tenant by reason of her post-petition divorce.[23] Under Debtor's formulation I would subtract the prior liens of $17,281.77 from the $20,500 to determine the extent of the S & S's secured claim. The result is a secured claim of $3,218.23 and an unsecured claim of $59,800.77.[24]

S & S, however, disagrees with this approach, contending that the full value of the Property must be included from which the prior liens which attach to the Property would be subtracted. No reduction would occur as a consequence of Debtor's undivided interest. Under S & S's formulation, the value of the property to attach to S & S's liens, and the resulting secured portion of S & S's claim, would be $ $23,718.23 ($41,000 minus $17,281.77).

While it seems to me irrelevant for these purposes whether S & S has a secured claim of $3,218.23 or $23,718.23 given the clear applicability of Dewsnup's prohibition on lien stripping a partially secured claim in Chapter 7, I will address the above dispute consistent with the District Court's directive.

Although not clearly articulated as such, it appears that the parties' disagreement flows from the fact that due to Debtor's post-petition divorce, she now holds the Property as a joint tenant whereas on the petition date, her interest was as a tenant in the entirety. The Debtor supports her view by citation to a line of cases decided by this Court. In *In re Jablonski*, 70 B.R. 381 (Bankr.E.D.Pa.1987), *aff'd* 88 B.R. 652 (E.D.Pa.1988) and *In re Panas*, 68 B.R. 421 (Bankr.E.D.Pa.1986), property was held as tenants by entireties, and the entire value was included for measuring the estate's interest even though only one marital partner had filed for bankruptcy. The liens were therefore deducted from the value of the property, and the claimant held a secured claim for the difference. Applying the foregoing cases, S & S would have a claim for $23,718.23, and there would be no reduction for her having less than an entire interest in the Property. While S & S has not presented any legal authority for its view,[25] this line of cases

---

**23.** In her brief in support of the Valuation Motion, Debtor argued that the dispositive date for valuation was the date of the hearing, citing to a Chapter 11 case and a Chapter 13 case which stated that the significant date for valuation for the purposes of confirmation was the confirmation hearing or effective date of the plan (or as close thereto as possible). Those cases are not applicable in a Chapter 7 liquidation case.

**24.** Of course, the application of Debtor's formulation results in no secured claim when Debtor's valuation of $35,000 and prior liens of $19,303.07 are used (*i.e.*, 50% of $35,000 or $17,500 minus $19,303.07). Notably, even if I accepted Debtor's value of $35,000 and her formula for calculating the secured claim, there would be a resulting secured claim here ($17,500 minus $17,271.77), and on the judi-cially determined value of $41,000, there would be a secured claim even if I accepted the Debtor's calculation of prior municipal liens.

**25.** S & S's three-page Memorandum in Opposition to the Valuation Motion focused on the § 506(d) issue, contending that modification was not permissible. Thus, rather than present any authority on these issues, it stated that the divorce decree had no impact on value because the mortgage could not be modified. However, assuming that I found a cramdown to be permissible, it contended that the secured claim would be the value of the property less prior liens. It made no reduction for the Debtor's less than full interest.

would support its contention that its secured claim under § 506(a) would be equal to the full value of the property less prior liens.

Debtor, on the other hand, distinguishes these cases where the debtor holds a tenancy by entireties, relying on *Crompton v. Boulevard Mortgage Co. (In re Crompton )*, 68 B.R. 831 (Bankr.E.D.Pa.1987) and *Whitener v. Graham (In re Whitener)*, 63 B.R. 701 (Bankr.E.D.Pa.1986). In these cases, property was held as tenants in common, and only one half of the value of the property was included for calculating the secured claim. In *Crompton* there were no prior liens on the property so the secured claim was measured by half of the value of the property. In *Whitener*, on the other hand, there existed prior liens which the court deducted in full from the debtor's partial interest in the property, rendering the claim unsecured. Thus, there are two issues I must resolve before I can affix a number to S & S's secured claim: (1) is the estate's interest in the Property equal to its full value or 50% and (2) if only half the property value is included, is the calculation based on value before or after prior liens are deducted.

▇▇▇ The Bankruptcy Code broadly defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). State law determines the existence and scope of a debtor's property. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Under Pennsylvania law, at the commencement of this case Debtor held the Property as a tenant by entireties with her husband, and that then became the estate's interest in the Property. However, the Code also provides that certain property acquired by the debtor within 180 days of filing of the petition becomes property of the estate. Included in the property treated in this manner is any interest in property acquired as a result of a final divorce decree. 11 U.S.C. § 541(d)(B). While decided in the context of exemption litigation, the Fourth Circuit Court of Appeals has concluded that the postpetition entry of a divorce decree within 180 days which destroyed debtor's tenancy by the entireties created a new property interest, a fee simple interest that became part of the estate. *Cordova v. Mayer (In re Cordova)*, 73 F.3d 38 (4th Cir.1996). Likewise here, the Debtor's tenancy by the entireties was terminated by operation of law as a result of her divorce decree obtained within 180 days of her bankruptcy filing so that her estate's interest in the Property is as a tenant in common. Following *Crompton*, it is appropriate to value that interest at 50%.[26]

---

**26.** Debtor assumes that her tenancy in common is worth 50% of the value of the Property. S & S does not dispute that valuation. Rather S & S argues against any reduction to the full value because it leaves it with a "meaningless, uncollectible claim on the husband's half-ownership with the only available option to partition the premises." S & S Memorandum at 2–3. At least one court agrees, refusing to perform a § 506(a) valuation when the property is held by the debtor and non-debtors. As stated by the Court in *Rodriguez v. Madera County Federal Credit Union (In re Rodriguez)*, 156 B.R. 659, 659–60 (Bankr.E.D.Cal.1993):

This results in the creditor still having a secured claim in the full amount of the obligation as to the 50% of the property not belonging to the estate, but belonging to the co-owner/co-obligor. Where does such a confusion of rights and interests leave the

parties involved? Pending a more insightful analysis not presently available to the court, the only logical result is to rule that a debtor holding only a fractional interest in property cannot utilize section 506 to value a secured claim.

By the same token, it makes little sense for the debtor either, if he or she is intending to use bankruptcy to gain clear title to property since the lien will remain against the co-owner's interest and be vulnerable to foreclosure if not paid. A subsequent § 506(d) proceeding will not be able to avoid the lien of the mortgage as to the non-debtor ex-husband who is still liable for the full amount of the debt. *Hunter v. Nixon et al. (In re Hunter)*, 101 B.R. 294, 298 (Bankr.S.D.Ala.1989).

It is the province of the legislature not this Court to carve out an exception under § 506(a) for partial interests. Thus, while these arguments are compelling, I am not free

I next turn to whether the liens must be subtracted from the value of the debtor's partial interest or from the full value of the property before calculating the debtor's partial interest. *Whitener* is the only case I could find that resolved this issue in deciding a § 506(a) motion, albeit without any discussion. *Crompton* which embraces *Whitener* apparently does so only with respect to the tenant by entireties/tenants in common distinction since no liens were involved in that case.

While I could find no cases that discussed whether for the purposes of § 506(a) liens were subtracted prior to calculating an estate's interest in the property or after,[27] the issue has been of considerable debate in determining a debtor's interest in the property in the context of the lien avoidance provisions of § 522(f). There are two lines of cases. One holds that the court is obligated to construe the statutory language literally. In the view of these courts, the plain meaning of the statute requires that the lien to be avoided and all liens of the property be added to the exemption and deducted from the debtor's interest in the property absent any liens. That calculation thus involves the subtraction of the full amount of all liens and the exemption from the debtor's interest which may be less than a full interest. *E.g., Zeigler Engineering Sales, Inc. v. Cozad (In re Cozad)*, 208 B.R. 495, 498 (10th Cir. BAP 1997); *In re Piersol*, 244 B.R. 309 (Bankr.E.D.Pa.2000).[28] However, other courts find that a literal interpretation of the statute provides windfall for the debtor clearly not intended by Congress. These courts rely on principles of statutory construction that allow a court to refuse to give effect to the plain meaning

of the statute when to do would lead to an absurd result. *E.g., Lehman v. Vision-Span, Inc. (In re Lehman)*, 205 F.3d 1255 (11th Cir.2000); *Nelson v. Scala*, 192 F.3d 32 (1st Cir.1999); *Wiget v. Nielsen (In re Nielsen)*, 197 B.R. 665 (9th Cir. BAP 1996). These courts conclude that § 522(f) is intended to protect in full, but only in full, a debtor's exemptions and that failing to calculate net equity before determining a debtor's interest confers more than the fresh start Congress intended. *See also Schwaber v. Reed (In re Reed)*, 940 F.2d 1317, 1322 (9th Cir.1991)(court rejected debtor's argument that the bankruptcy estate had no interest in the residence at the commencement of the case because the value of debtor's one-half joint tenancy interest less the full value of encumbrances and the homestead exemption would be a negative number, finding that the bankruptcy estate had an interest in one-half of the *net* proceeds of sale less the exemption; as the trustee could have sold the property in its entirety under § 363(h), it was sensible to divide the proceeds as if he had done so).

The Third Circuit Court of Appeals has not addressed the meaning of "estate's interest in the property" under § 506 or for that matter, "debtor's interest in the property" under § 522 so I am without guidance in deciding how to calculate the secured claim when the debtor holds only a partial interest in property and the full interest is encumbered by a prior lien. I am, however, mindful of the Court's recent decision in *First Merchants Acceptance Corp. v. J.C. Bradford & Co.*, 198 F.3d 394 (3d Cir.1999), in which it adopted a plain language reading of Code § 503(b)(4) to allow compensation to be awarded to pro-

---

to refuse to conduct a § 506(a) valuation where the debtor has less than a full ownership interest.

27. In *In re Hermann*, 224 B.R. 101 (Bankr. D.Minn.1998), the Court found, without discussion, that the value of an individual joint tenancy interest, and therefore the allowed amount of IRS' secured claim, is one-half the debtors' equity in the homestead.

28. While *Piersol* was a § 522(f) case, Judge Scholl stated, in *dicta*, that jointly-owned non-entireties property would be valued in the same manner, *i.e.* by dividing the value among the interests of the co-owners, for purposes of § 506(a).

fessionals employed by members of the creditors' committee. The debtor and United States trustee had argued that such an interpretation was in conflict with congressional intent as reflected in the legislative history. The Court opined that "Supreme Court cases declaring that clear language cannot be overcome by contrary legislative intent are legion," and that "only absurd results and 'the most extraordinary showing of contrary intentions' justify a limitation on the plain meaning of the statutory language." *Id.* at 401–402 (*quoting Garcia v. U.S.*, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). The *First Merchants* decision produced a result that the Third Circuit acknowledged "leads inescapably to tension with the statutory scheme for retention of professionals by the [creditors'] committee established by § 1103"[29] and arguably conflicts with the intent of Congress as reflected in the House Report. *Id.* at 400.

Given the Third Circuit's interpretation of § 503(b)(4) according to its plain language notwithstanding these acknowledged conflicts, I can only conclude that it would likewise interpret "estate's interest in the property" literally. I understand a literal construction of that term to mean the estate's proportionate share of the property's value. 4 Collier on Bankruptcy ¶ 5.06.03[5][a], at 506–32. That value, in this case, is $20,500. To determine the extent to which a junior creditor holds an interest in the estate's interest in the property and hence the extent of the secured claim, the amount of debt secured by senior liens must be deducted from the estate's interest. *Id.*, at 506–33. That amount is $17,281.77. This construction of § 506(a) does not lead to an absurd result

because S & S will still retain its lien on the non-debtor's interest in the Property.[30] Accordingly, I find that S & S's interest in the estate's interest in the Property is $3,218.23, *i.e.*, $20,500 less $17,281.77. In so concluding, I note again that whichever formulaic approach is adopted, S & S has a secured claim and that fact, not the amount of the claim, ultimately is the only dispositive finding contained herein.

---

**29.** Section 1103 requires that prior to approving retention of committee counsel the court find that the applicant does not represent any other entity having an adverse interest in connection with the case. A professional employed under § 1103 may be awarded compensation under § 330(a) which is allowed as an administrative claim under § 503(b)(2). Under *First Merchants*, counsel for a committee member is allowed compensation under § 503(b)(4) without an examination of adverse interests required by § 1103.

**30.** Essentially this was S & S's argument for rejecting the formula advocated by Debtor and adopted here. S & S does not contend, nor do I find, any "extraordinary showing" of an intention to construe § 506(a) contrary to its plain meaning.